**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES C. TURNER, | CASE NO. 1:22-CV-00877-PAG |
| Plaintiff, | CHIEF JUDGE PATRICIA A. GAUGHAN |
| | UNITED STATES DISTRICT JUDGE |
| v. | |
| | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | CARMEN E. HENDERSON |
| Defendant, | **REPORT AND RECOMMENDATION** |

## I.      Introduction

Plaintiff, James C. Turner ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB"). This matter is before the Court pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is recommended that the Court AFFIRM the Commissioner of Social Security's nondisability finding.

## II.      Procedural History

Claimant filed applications for POD and DIB on February 12, 2014, alleging a disability onset date of July 28, 2013.[1] (ECF No. 9, PageID #: 54). His applications were denied initially and upon reconsideration, so Claimant requested a hearing before an administrative law judge

---

[1] In his brief, Claimant stated that he applied for POD and DIB on February 13, 2014. (*See* ECF No. 13, PageID #: 1805). The Court uses instead uses the initial ALJ's date from her decision. (*See* ECF No. 9, PageID #: 54).

1

("ALJ"). (ECF No. 9, PageID #: 54). On April 12, 2016, an ALJ held a video hearing, where Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 9, PageID #: 54). The ALJ issued a written decision finding Claimant was not disabled on April 22, 2016. (ECF No. 9, PageID #: 51). The ALJ's decision became final on August 5, 2016, when the Appeals Council declined further review. (ECF No. 9, PageID #: 35).

Claimant then appealed the Commissioner's final decision to the United States District Court for the Northern District of Ohio and obtained a stipulated remand. (ECF No. 9, PageID #: 1165). His second hearing took place on November 7, 2017 and resulted in another denial of benefits. (*See* ECF No. 9, PageID #: 1055–95 (second hearing), 1175 (decision denying benefits)). Claimant appealed this decision to the Appeals Council which remanded the case back to the ALJ to "adequately evaluate" opinion evidence in the record and further consider Claimant's subjective complaints. (ECF No. 9, PageID #: 1202–03). Specifically, the Appeals Council noted that the ALJ described but did not weigh the opinion of Dr. Hayden Tran, D.O., and the ALJ did not weigh specific restrictions Dr. Robert Blankfield, M.D., and Dr. Felicitas Juguilon, M.D., offered. (ECF No. 9, PageID #: 1202–03). The Appeals Council also found that the ALJ failed to discuss "numerous factors pertinent to the evaluation of subjective symptoms" including daily activities; the location, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors of symptoms; and the type, dosage, effectiveness, and side effects of medications. (ECF No. 9, PageID #: 1203). It also noted that

the ALJ rejected Claimant's "financial basis for the failure to pursue treatment with a neurologist." (ECF No. 9, PageID #: 1203).[2]

On October 30, 2019, Claimant attended a third hearing where he testified and was represented by counsel. (*See* ECF No. 9, PageID #: 1010). A vocational expert also testified. (*See* ECF No. 9, PageID #: 1010). The ALJ again denied him disability benefits, and the Appeals Council again remanded the case back for a hearing. (ECF No. 9, PageID #: 1206 (ALJ's unfavorable decision), 1244 (Appeals Council notice)). The Appeals Council found that the ALJ's decision did not "contain an adequate evaluation of all the treating source opinions in the record," including the opinions of Dr. Blankfield and Claimant's dentist. (ECF No. 9, PageID #: 1244). Despite Dr. Blankfield's opinion that Claimant was unable to work or volunteer twenty hours a week, and the dentist's opinion that Claimant should be on disability, the Appeals Council noted that the ALJ did not consider these opinions in her decision. (ECF No. 9, PageID #: 1244). The Appeals Council also noted that there "was no substantive discussion of the claimant's past work despite the claimant's representative introducing evidence the job may not be adequately described by this job title." (ECF No. 9, PageID #: 1244).

Claimant testified at his fourth hearing on April 12, 2021 and was represented by counsel. (ECF No. 9, PageID #: 924). A vocational expert also testified. (ECF No. 9, PageID #: 924). On April 26, 2021, the ALJ issued an unfavorable decision, which the Appeals Council declined to review. (ECF 9, PageID #: 921 (ALJ's decision), 910 (Appeals Council notice)). Accordingly, Claimant filed a complaint in federal court to challenge the Commissioner's final decision. (ECF

---

[2] The Appeals Council also found fault with the ALJ's failure to ask the vocational expert about Claimant's ability to perform jobs with an assistive device. (ECF No. 9, PageID #: 1203). As this is not at issue in this case, the Court will not address it further.

No. 1). The parties have completed briefing in this case. (ECF Nos. 13, 15, 16). Claimant asserts

the following assignments of error:

> (1) Whether the administrative law judge erred in the evaluation of
> treating physician opinion where the opinions of treating
> physicians Dr. Juguilon and Dr. Blankfield document an inability
> to sustain work on a regular and continuing basis at even a
> sedentary level of exertion, these opinions are consistent with and
> supported by Mr. Turner's underlying impairments, including
> fibromyalgia, and the administrative law judge erred in failing to
> consider all relevant factors under Social Security's regulations?

> (2) Whether the administrative law judge erred in the evaluation of
> pain and other symptoms where she ignored side effects of
> medication because she disagreed with the treating physician's
> course of treatment, she ignored the impact of Mr. Turner's
> fibromyalgia because of limited tender point findings, she ignored
> testimony concerning Mr. Turner's financial inability to obtain
> extensive treatment, and she failed to consider Mr. Turner's post-
> West Nile Virus syndrome in combination with other impairments?

(ECF No. 13, PageID #: 1804).

## III.  Background

## A.  Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Plaintiff's hearing:

> The claimant alleges that he cannot sustain full time employment
> due to a combination of symptoms from his impairments including
> fibromyalgia, chronic fatigue, compression fractures in spine;
> cervical, thoracic, and lumbar degeneration in back; and chronic
> back pain (4E; 6E; hearing testimony). He testified in hearings that
> he is unable to work due to his ambulatory difficulties, his tremor,
> and difficulty with short-term memory (hearing testimony). He
> testified that his back pain has gotten progressively worse with
> time, and that his symptoms from asthma have also worsened with
> time (hearing testimony). The claimant reported that he stopped
> working due to breathing difficulties, mobility issues, and joint and
> back pain. He testified that he spends most of his time in a recliner
> with his feet elevated at home to get relief from back and joint
> pains (hearing testimony).

> Notably, the claimant testified at a prior hearing in 2019 that he did

4

not follow up about getting insurance through other means or resources since the last hearing in this matter (hearing testimony). He testified he had heard about MetroHealth Institution, but had not attempted to talk to anyone about pursuing low- cost medical care or treatment since the prior hearings (hearing testimony). He also testified previously that he had medical insurance coverage through his wife's employer, and that he had a period of coverage through her previous employer as well (hearing testimony). Further, he testified that at one point he had coverage with Medicaid through help from Lorain County Job and Family Services, but then was no longer covered due to household income being too high (hearing testimony). After that point, the claimant testified that he did not seek assistance for healthcare coverage, insurance, or low cost providers from other sources (hearing testimony). . . . The claimant reported hand tremors, explaining that he occasionally spilled food and drink on himself (18F/29; hearing testimony).

(ECF No. 9, PageID #: 933, 940).

Claimant's allegations of various neurological symptoms and West Nile Virus are at issue in this case. (*See* ECF No. 13, PageID #: 1825–26, 1832). In April 2017, Claimant reported several of these symptoms to his treating physician, Dr. Robert Blankfield, M.D., who summarized them in a letter to Claimant's then-lawyer:

[Claimant] was evaluated in the office on April 6, 2017. At that time, he reported the onset of neurological symptoms that had developed in recent months. He reported that he sometimes had difficulty finding the right word to say, and he also reported that he sometimes had difficulty articulating words when he was speaking. In addition, he had experienced several near falls in recent weeks, and he reported that he had fallen on one occasion a couple weeks earlier. [Claimant] could provide no explanation for the fall because he had not tripped on anything. He informed me that he can no longer stand in the shower with his eyes closed.

(ECF No. 9, PageID #: 1682).

## B.  Relevant Medical Evidence

The ALJ also summarized Plaintiff's health records and symptoms:

On  April  11,  2013,  the  claimant  underwent  evaluation  with

5

neurologist Michal T. Gostkowski, DO., complaining of back pain, hand weakness, headache, and ear pain (3F/30-34). The claimant admitted that he had been improving with physical therapy, which Dr. Gostkowski noted had been discontinued several times for questionable medical reasons (3F/30-34). Examination findings, discussed in detail above, revealed mild pain-related weakness of the left hand, but was otherwise unremarkable, as the claimant maintained clear lungs, normal psychiatric functioning, and normal neurological functioning, with extremity strength, normal gait and coordination, intact ability to walk on heels, tiptoes, tandem, and backwards, intact sensation, normal reflexes, no tremor, and easy ability to rise from seated position (3F/30-34). Dr. Gostkowski instructed the claimant to restart physical therapy, wean fentanyl patches, and start Lidoderm patches and Flexeril 10 mg (3F/30-34).

An MRI of the lumbar spine performed on May 3, 2013 showed mild degenerative spondylosis of the upper and lower lumbar spine, with no focal area of disc herniation or spinal canal stenosis (5F/30-31; 9F/29-30).

The claimant generally pursued a conservative course of treatment for his mild degenerative disc disease of the lumbar spine, fibromyalgia, and mild anterior wedge vertebral compression deformities at the thoracolumbar junction, including outpatient office visits and medication management. During the relevant period, he reported ongoing lower back pain and cervical pain, with some bilateral hip pain and left knee pain (5F/6). At an initial exam on September 12, 2013, Dr. Juguilon indicated the claimant had 16/18 positive trigger points, which satisfies the criteria of SSR 12-2p to establish fibromyalgia as a medically determinable impairment (4F/12- 13). Throughout 2013, the claimant also received several epidural steroid injections for his back pain at various levels (1F/8, 10, 12, 14; 5F/28; 9F/27, 47, 49, 53).

On August 22, 2013, the claimant underwent evaluation with neurologist Basha Alshareef, M.D., for twitching and muscle spasm mainly in the lower extremities (3F/36-40). Physical examination revealed very subtle fine tremors in the bilateral hands, but was otherwise normal, as the claimant maintained full strength and normal sensation in all extremities, intact coordination, bilateral upper and lower extremity reflexes within normal limits, a stable, independent gait, and intact ability to perform heel walk, toe walk, and tandem walk (3F/38-39). Dr. Alshareef noted the MRI of his spine did not explain the claimant's symptoms, and it was possible that his presentation was either a

6

neurological manifestation of celiac disease or post gastric procedure complications (3F/39).

On September 12, 2013, the claimant began treatment with Felicitas Jugulon, M.D. (sic), of Innovative Health and Wellness Center, complaining of aching joints, headache, fatigue, depression, nervousness, irritability, and memory difficulty (4F/11-13). The claimant reported a history of West Nile virus, and indicated that he was depressed because he had been to various specialists, without improvement of his symptoms (4F/11-13). The claimant reported waking four to five times per night, but was admittedly not using his CPAP machine (4F/11-13). Examination revealed obesity, with a BMI of 37.5, 16 of 18 positive tender points, and diminished ankle reflexes bilaterally, but was otherwise normal (4F/11-13). Dr. Jugulon (sic) diagnosed the claimant with fibromyalgia, chronic fatigue, endocrine disorder unspecified, history of sleep apnea, and situational depression, and informed the claimant that he must use a CPAP (4F/13). Treatment records from October 2013 through July 2015 contain reports of jerk reaction while sleeping, headaches, dizziness, pain, and memory difficulty, and the claimant remained obese on examination (4F; 13F; 17F). Dr. Jugulion (sic) ordered mitochondrial IV infusions and prescribed Acyclovir (4F; 13F; 17F). The claimant reported ongoing pain, but admitted improved headaches, irritability, and nervousness (4F; 13F; 17F).

The claimant also treated with outpatient follow up office visits with Dr. Blankfield approximately once every three months for his ongoing reported pain and symptoms related to fibromyalgia, lower back pain, and other reported join pain in his shoulders, knee, and hips (5F; 11F; 18F; 23F; 27F; 28F). Dr. Blankfield continued to prescribe the claimant pain medication for his pain symptoms, including fentanyl and Celebrex, throughout the relevant period approximately once every three months (18F; 21F; 23F; 27F; 28F). The treatment notes indicate the claimant used fentanyl patches every 3 days for some pain relief and that it allowed him to be more functional, and he used Celebrex daily for additional relief above and beyond the fentanyl (18F; 21F; 27F; 28F/1).

The claimant continued to treat conservatively with medication management throughout the relevant period. He received injections in his right shoulder, left knee, and back throughout the relevant period, reporting some temporary relief from pain after the injections (1F/8, 10, 12, 14; 5F/28; 9F/27, 47, 49, 53; 18F/28, 39). At times he also reported tremors in his hands stating that, on

occasion, he had spilled food and drink on himself due to the hand tremor (18F/29; hearing testimony). Exam notes from a follow-up with Dr. Blankfield in January 2017 note he walked with a limp and he reported that he used furniture for support, and the assessment/plan noted Dr. Blankfield "recommend that he use a cane" (21F/1). Treatment records also indicate the claimant reported some issues with balance at an April 2017 follow up appointment, stating he fell once and almost fell a couple times (21F/4). Treatment notes from that date indicate results from a neurological exam showed "alertness, orientation, speech, cranial nerves II through XII, sensory examination to touch, pronator drift sign bilaterally, rapid alternating movements bilaterally, deep tendon reflexes. Mild dysmetria on finger to nose bilat. Romberg positive. Walks with a limp. Has an intention tremor" (21F/4). The claimant was continued on fentanyl patches and a neurology consultation was recommended with suggestion that the claimant contact the neurology clinic at Metro health Medical Center (21F/4-5). The next appointment notes indicate he had not consulted a neurologist yet, that he was caring for his 77-year-old father, and that he appeared walking with a cane (21F/7).

The treatment records from Dr. Blankfield generally do not show evidence of any detailed physical examination documenting an assessment of all the claimant's systems or specific reference to a trigger point examination (5F/7-11; 11F; 18F; 21F; 23F; 27F; 28F). Dr. Blankfield noted in treatment records from 2014 that another physician diagnosed the claimant with fibromyalgia, but there is no indication that Dr. Blankfield performed testing to confirm the specific trigger points (5F/6). Throughout the relevant period, Dr. Blankfield's examination findings were generally limited to blood pressure, height, and weight, but did not generally note areas that would be expected for assessment of impairments of fibromyalgia and degenerative disc disease, such as range of motion, strength, sensation, or straight leg raise tests (5F; 11F; 18F; 21F; 23F; 27F; 28F). A few times the treatment notes state that "there are multiple trigger points of pain involving the thoracolumbar spine" but do not further explain, detail, or specifically note the testing or which trigger points were involved (27F/7, 13; 28F/1). Moreover, Dr. Blankfield's sparse office visit notes and minimal documentation of clinical findings fail to include an analysis or evaluation of the claimant's response to treatment or potential improvement in the number or location of "signs" of fibromyalgia. In this regard it is notable that Dr. Juigulon's (sic) assessment is the only examination that documented the number and location of trigger points.

8

The notes also sporadically indicate that the claimant demonstrated grip strength 4/51 bilaterally; opposition digits 1-2 were 5/5 bilaterally; opposition digits 1-5 were 4/5 bilaterally; and 5/5 in all other muscle groups in the upper extremities (27F/7). A strength rating of 4/5 is still adequate to perform many tasks with one's hands and fingers. Despite the vague statement that "multiple trigger points of tenderness thoracolumbar spine," treatment notes from a medication management appointment in January 2019, indicate neurological exam results showing normal sensation in both upper and lower extremities and normal movement of both upper and lower extremities (27F/13).

Additionally, the claimant attended a neurological evaluation with Suresh Kumar, M.D., on September 11, 2019 (29F/1-4). The claimant reported chronic pain that moves throughout his body; decreased sensation dorsum of the left foot; osteoarthrosis of the spine; tremors in his hands with the right worse than the left; occasional jerking of the hand or finger, which does not significantly interfere with functionality; and problems with imbalance (29F/3). Physical examination revealed normal speech, language, attention, concentration, and orientation; facial sensations and hearing were normal; neck was supple; normal strength and muscle tone; normal muscle reflexes; no abnormal involuntary movements and no atrophy; normal sensory exam except for decreased sensation in the dorsum of the left foot; normal breath sounds; and no cyanosis, clubbing, or edema (29F/4). The exam notes also indicated the claimant had some imbalance and used a cane to walk safely during the exam (29F/4). Overall, Dr. Kumar's assessment after evaluation noted most likely represented an essential tremor; doubt Parkinson's disease or other Parkinsonian syndromes (29F/4). Dr. Kumar also noted medications such as bupropion can sometimes aggravate this, however the claimant had been on buproprion (sic) for the past two years, but also noted that medications used for asthma can also exacerbate the tremor (29F). Dr. Kumar noted the claimant reported chronic pain, and that his imbalance was probably multifactorial including osteoarthrosis, degenerative joint disease of the spine, and noted that medications such as gabapentin and fentanyl patch can also contribute to imbalance (29F/4).

The claimant continued to follow up with Dr. Blankfield approximately once every three months throughout 2018, 2019, and 2020 for medication refills (27F; 28F; 30F; 32F). The treatment records generally note the claimant reported prescribed medications, including fentanyl, helped with pain he experienced due to fibromyalgia (27F/1, 4, 7, 10, 13). The records continue to

note a diagnosis of fibromyalgia, and notes that there was tenderness to palpation of the right at the first CMC joint of the right thumb and "multiple trigger points of pain involving the thoracolumbar spine" as well as vitals and measurements including body height, weight, blood pressure; but the treatment records do not contain details of physical examination or triggerpoint (sic) examinations (27F/1, 4, 7, 10, 13; 32F/1). The treatment records from Dr. Blankfield generally do not show evidence of any detailed physical examination documenting an assessment of all the claimant's systems or specific reference to a trigger point examination that included documentation of the number and location of the trigger points. Dr. Blankfield's examination findings were generally limited to blood pressure, height, and weight, and did not generally note areas that would be expected for assessment of impairments of fibromyalgia and degenerative disc disease, such as range of motion, strength, sensation, or straight leg raise tests. Dr. Blankfield's sparse office visit notes and minimal documentation of clinical findings fail to include an analysis or evaluation of the claimant's response to treatment or potential improvement in the number or location of fibromyalgia signs or his other conditions that would support his medical decision to continue prescribing the claimant with strong narcotic medication, particularly since the specialist, Dr. Gostkowski, a neurologist, instructed the claimant to wean fentanyl patches in 2013. (3F/30-34). Also noting that another neurologist, Dr. Kumar, noted that the claimant's complaint of balance issues could also be caused from his narcotic medications that Dr. Blankfield was prescribing. (29F/4)

[. . .]

At a follow up in January 2019, the records include physical exam findings that the claimant had normal sensation in both upper and lower extremities; normal movement of both upper and lower extremities; affect was unremarkable; and had "mult trigger points of tenderness thoracolumbar spine" and his prescription for fentanyl was refilled (27F/13). At an April 2019 office visit, Dr. Blankfield noted that there was "NT palp to the C spine;" he had decreased range of motion in the neck; there was tenderness to palpation of the CMC joints of both thumbs – more so on the right than the left. The left knee was not warm or swollen in relation to the right but there was marked crepitance (sic) with flexion/extension of the left knee; and the claimant walked with an antalgic limp, but did not mention the use of a cane (27F/16). X-rays of the cervical spine from April 17, 2019 showed slight straightening of the normal cervical lordosis with degenerative disc

10

changes at C5/C6 with intervertebral disc height loss and anterior osteophyte formation, but vertebral body height and alignment were maintained and the predental space and prevertebral soft tissues were within normal limits (27F/20). X-rays of both hands showed mild osteoarthritic changes at the first CMC joints bilaterally with no other abnormalities (27F/22-24). Finally, an xray exam of the left knee from April 2019 was normal (27F/26). In January 2020, the claimant requested and received an injection in the left knee for pain and osteoarthritis of the left knee (32F/4-5).

[ . . . ]

Additionally, on May 3, 2014, the claimant underwent consultative examination with Hayden Tran, DO., reporting a history of fibromyalgia and back, neck, and shoulder problems with current left arm and finger numbness, fatigue, shortness of breath, knee, neck, back, and hip pain, poor sleep, fatigue, and difficulty concentrating (7F). The claimant reported typical daily activities such as doing things around the house (7F). Examination revealed a height of 6'1", weight of 315 pounds; noted slow, but steady, antalgic gait; decreased sensation to light touch at the left arm; very limited straight leg raising with pain at 25 degrees bilaterally; slightly reduced extremity strength; inability to squat and rise; and difficulty getting up and down from the examination table (7F/3-5). However, the claimant maintained normal respiration, coordination, and reflexes; was able to lift, carry, and handle light objects; and was able to rise from sitting without assistance (7F/3-5). He was unable to walk on heels or toes, and could not stand or hop on one foot bilaterally; however, he maintained normal tandem walking (7F/3-5). Examination revealed decreased range of motion of the cervical spine, lumbar spine, and bilateral shoulders, hips, and knees; however, the claimant maintained normal range of motion of the bilateral elbows, wrists, hands, fingers, and ankles (7F/7-9). Dr. Tran diagnosed the claimant with polyarthralgia, probable osteoarthritis, probable fibromyalgia, probable cervical nerve impingement by history; cervical radiculopathy of the left arm secondary to cervical nerve impingement; history of cervical nerve impingement; and low back pain, probable osteoarthritis, and noted that the claimant's condition appears to be relatively declining (7F/5-6).

(ECF No. 9, PageID #: 934–40).

## C.  Opinion Evidence at Issue

Claimant challenges the ALJ's decision to withhold controlling weight from two experts, Dr. Blankfield and Dr. Juguilon. (*See* ECF No. 13, PageID #: 1821). Dr. Blankfield began treating Claimant in 1998 and continued to regularly treat him during the period at issue. (*See* ECF No. 9, PageID #: 623; *see generally* Exhibits 9F, 11F, 12F, 14F, 15F, 18F). He authored a number of opinions during the period of issue, but on May 23, 2014, he recommended formal physical limitations: Claimant can stand/walk ten to fifteen minutes a day, and stand/walk one and a half to two hours during an eight-hour day; sit thirty minutes at one time and four to five hours total during an eight-hour day; lift and carry five to ten pounds occasionally and zero to two pounds frequently; work one to two hours a day; and miss more than four days a month. (ECF No. 9, PageID #: 622–23). Dr. Blankfield also noted Claimant had "difficulty concentrating and focusing." (ECF No. 9, PageID #: 623).

Dr. Blankfield authored another opinion on June 30, 2014. (ECF No. 9, PageID #: 720). His letter states that Claimant "is unable to work or volunteer 20 hours per week due to his disability. His disability is permanent." (ECF No. 9, PageID #: 720).

Dr. Blankfield authored multiple opinions about Claimant's West Nile Virus and its long-term effects. (*See* ECF No. 9, PageID #: 1682–83, 1797). On July 10, 2017, Dr. Blankfield noted Claimant's alleged neurological symptoms and linked them to his 2001 West Nile Virus diagnosis. (ECF No. 9, PageID #: 1682–83). He concluded:

> It is my medical opinion that [Claimant's] ataxia, dysphasia and dysarthria are late complications resulting from a case of West Nile Virus meningitis that occurred in 2001. [Claimant's] neurological status is likely to progressively worsen until he becomes wheelchair bound, unable to speak, and unable to care for himself. He ought to be under the care of a neurologist.
>
> [Claimant] has a long-standing fibromyalgia-like condition that is most likely the result of the West Nile Virus meningitis. The fibromyalgia should have qualified him for disability years ago.

12

> Now that [Claimant] has ataxia, dysphasia and dysarthria, he is
> additionally unable to work.

(ECF No. 9, PageID #: 1683).

Dr. Blankfield wrote another opinion about Claimant's West Nile Virus for the most

recent remand. (*See* ECF No. 13, PageID #: 1825–26). He opined:

> [Claimant's] condition is analagous (sic) to Long Haul Covid-19
> that afflicts many individuals who survive Covid-19, Long Haul
> Covid-19 is a post-viral condition that manifests in myriad ways.
> Individuals with Long Haul Covid-19 report chronic fatigue,
> exercise intolerance, headaches, body aches, difficulty
> concentrating, brain fog. cognitive impairment, long term inability
> to smell, and/or long term inability to taste. Medical science cannot
> explain why some individuals develop Long Haul Covid-19. It
> may be due an overactive immune response to Covid-19. It may be
> due to direct effects of Covid-l9 upon the brain.
>
> Since contracting West Nile Virus in 2001, [Claimant] has, in
> essence, Long Haul West Nile Virus. It may be due to an
> overactive immune response to West Nile Virus. It may be due to
> the effects of West Nile virus upon his brain. [Claimant] has
> chronic body aches, chronic fatigue, impaired balance that
> interferes with his ability to stand, exercise intolerance, a tremor
> that interferes with his ability to use silverware or drink from a
> cup, impaired concentration, and brain fog that interferes with his
> ability to find words to express himself.
>
> Many individuals with Long Haul Covid-19 are disabled, either
> temporarily or permanently. [Claimant] is permanently disabled
> due to Long Haul West Nile Virus.

(ECF No. 9, PageID #: 1797).

Dr. Juguilon first treated Claimant in September 2013 and continued to see him through

July 2015 for fibromyalgia and chronic fatigue, among other conditions. (*See* ECF No. 9, PageID

#: 537, 619, 794–96). At Claimant's first appointment, Dr. Juguilon conducted a trigger point

test for fibromyalgia and identified 16/18 tender points. (ECF No. 9, PageID #: 538–39). She

later authored a functional opinion on May 22, 2014, recommending the following limitations:

13

Claimant can stand/walk for fifteen minutes at a time and one and a half hours total in an eight-hour day; sit thirty minutes at a time and four hours total in an eight-hour day; lift and carry ten pounds occasionally and one pound frequently; and can work zero hours a day. (ECF No. 9, PageID #: 618–19).

### IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 28, 2013 through his date last insured of September 30, 2019 (20 CFR 404.1571 et seq.).

> 3. Through the date last insured, the claimant had the following severe impairments: mild degenerative disc disease of the lumbar spine; mild anterior wedge vertebral compression deformities at the thoracolumbar junction; fibromyalgia; asthma; obesity; and sleep apnea (20 CFR 404.1520(c)).

> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

> 5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except limited to frequently climbing ramps and stairs; frequently balancing, kneeling, and crouching. He must avoid concentrated exposure to extreme cold and heat. The claimant must avoid concentrated exposure to humidity and concentrated exposure to respiratory irritants such as fumes, odors, dusts, gases, and poor ventilation. He must avoid all exposure to hazards such as operating heavy industrial machinery or being around it (such as power-saws and jackhammers), and working in unprotected heights.

> 6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from July 28, 2013, the alleged onset date, through September 30, 2019, the date last insured (20 CFR 404.1520(g)).

(ECF No. 9, PageID #: 927, 931, 932–33, 949, 950–51, 952).

## V.     Law & Analysis

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (en banc)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B.  Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to DIB: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

## C. Discussion

Claimant raises two issues on appeal. First, he challenges the weight the ALJ gave the opinions of Dr. Juguilon and Dr. Blankfield. (ECF No. 13, PageID #: 1821–26). Second, he argues the ALJ improperly discredited his subjective complaints of pain and other symptoms. (ECF No. 13, PageID #: 1827–33). The Court will address these concerns in the following sections.

### 1. The ALJ did not err in her review of the expert opinions

Claimant argues that the ALJ focused "almost exclusively" on the supportability of Dr. Juguilon and Dr. Blankfield's opinions, rather than the other factors she must consider under

§ 404.1527. (*See* ECF No. 13, PageID #: 1822). He claims the ALJ "never" addressed the consistency of the opinions, nor the extent of the treatment relationships, and that the ALJ improperly failed to address "all" the factors in § 404.1527. (ECF No. 13, PageID #: 1823, 1827). Claimant also takes issue with the state agency physicians' opinions, alleging they failed to note his fibromyalgia diagnosis. (ECF No. 13, PageID #: 1824).[3] The Commissioner argues that the ALJ gave both experts' opinions little weight for good reason and stated this rationale in her decision. (*See* ECF No. 15, PageID #: 1843, 1844, 1846–47, 1848).

Under the treating source rule,[4] an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting § 404.1527(d)(2) (eff. to July 31, 2006))). "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." Social Security Ruling ("SSR") 96–2p, 1996 WL 374188, at *2 (July 2, 1996).

---

[3] In arguing that the ALJ improperly discredited the opinions of Dr. Blankfield and Dr. Juguilon, Claimant also makes several arguments related to his subjective complaints and the RFC. (*See* ECF No. 13, PageID #: 1826). For instance, Claimant contends that the ALJ failed to explain how she accounted for fibromyalgia in the RFC and that she substituted her lay opinion for Dr. Blankfield's opinion regarding her West Nile Virus diagnosis. (*See* ECF No. 13, PageID #: 1823–24, 1826). Since these claims are better aligned with Claimant's other arguments discussed below, the Court will address these allegations there.

[4] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. *See* § 416.927. Plaintiff filed his claim before the revision took effect.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* § 404.1527(c)(2) (eff. Aug. 24, 2012). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR No. 96–2p, 1996 WL 374188, at *5). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson*, 378 F.3d at 544). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

### a.  Dr. Blankfield

Dr. Blankfield authored five opinions the ALJ considered dating from 2014, 2015, 2017, and 2021. She gave the 2015 opinion "no weight" and the rest "scant weight" for a variety of reasons. (*See* ECF No. 9, PageID #: 945–48). The ALJ noted that Dr. Blankfield was one of Claimant's treating sources before reviewing each of the physician's opinions. (*See* ECF No. 9, PageID #: 943).

18

Here, Claimant challenges the ALJ's treatment of Dr. Blankfield's 2014, 2017, and 2021 opinions. (ECF No. 13, PageID #: 1821, 1825, 1826). The Court will review each in turn.

The ALJ first reviewed two of Dr. Blankfield's 2014 opinions and gave them "scant" weight. (*See* ECF No. 9, PageID #: 945). The first record was a form entitled "Medical Source Statement: Physical Abilities and Limitations" dated May 23, 2014. (ECF No. 9, PageID #: 622–23). The ALJ noted that Dr. Blankfield stated in the form that he has been treating Claimant since December 17, 1998 and recommended the following limitations:

> [C]laimant was limited to standing/walking for 10-15 minutes at one time and to 1.5-2 hours total in an 8-hour period (9F/2). Further he opined the claimant was limited to sitting 30 minutes at one time and sitting for 4-5 hours total in an 8-hour period with intermittent breaks (9F/2). Dr. Blankfield went on to opine the claimant was limited to lifting/carrying 5-10 pounds occasionally, and 0-2 pounds frequently, stating all of these limitations were due generally to neck, back, shoulder, and hip pain (9F/2). He opined the claimant had no limitations in fingering, handling, or reaching, and that the claimant could work 1-2 hours on a "typical day" and would likely be absent more than four days per month (9F/3).

(ECF No. 9, PageID #: 944). The ALJ also noted that Dr. Blankfield cited to back, neck, shoulder, and hip pain and found that Claimant experienced dizziness and had difficulties concentrating. (ECF No. 9, PageID #: 945). Ultimately, the ALJ gave this opinion "scant weight" for the following reasons:

> [The restrictions] are not well supported from the medical evidence (9F). Similar to the opinions from Dr. Juigulon (sic) on the same pre-printed form, Dr. Blankfield's opinions regarding standing/walking, sitting, lifting/carrying, working hours, and work attendance, reference subjectively reported symptoms but did not identify specific diagnostic testing or objective findings to support the limitations offered from the medical evidence or treatment records (8F; 9F; 27F; 32F). Moreover, there are other findings in the record which contradict the limits offered in Dr. Blankfield's opinions, specifically, Dr. Gostowski noted normal neurological exam findings and the MRI study showed no more than minimal changes (3F/30-38; 5F/30-31; 9F/29-30). Ongoing treatment

19

records from Dr. Blankfield failed to document appropriate physical examinations of all body systems, but simply noted "multiple trigger points of pain" in the thoracolumbar spine and some tenderness in the first CMC joint of the right thumb (27F; 32F). Dr. Blankfield's treatment records of follow up appointments approximately once every three months for medication refills did not document any findings that would suggest he examined, evaluated, tested, and/or concluded the functional status of the claimant for lifting/carrying, walking, range of motion, strength, etc., on a routine basis (27F; 28F; 30F; 32F). With regard to the opinions that the claimant has difficulty concentrating and focusing, there is no objective testing or reference to diagnostic testing to support this statement in Dr. Blankfield's treatment records or the overall evidence of record, and the undersigned notes that Dr. Blankfield does not opine to any specific limitations related to concentration or focus (4F; 5F; 11F; 12F; 13F; 14F; 18F; 21F; 23F; 27F; 28F). Furthermore, the opinion that the claimant would be absent more than 4 days per month is not supported by any reference to treatment or medical records and is not consistent with the overall evidence.

(ECF No. 9, PageID #: 945).

The ALJ first noted that this record was both unsupported by the record and inconsistent with other reports. (ECF No. 9, PageID #: 945). She pointed out that Dr. Blankfield failed to identify specific tests or objective findings to support his recommended restrictions. (ECF No. 9, PageID #: 945). Instead, the ALJ found that the physician appeared to simply reflect Claimant's subjective complaints. (ECF No. 9, PageID #: 945). She also specifically pointed out that Dr. Blankfield's recommendation that Claimant would be absent over four days a month was unsupported by any record and inconsistent with the evidence. (ECF No. 9, PageID #: 945). Further, the ALJ noted that other records contradicted Dr. Blankfield's restrictions, such as the neurological findings of Dr. Michal Gostkowski, D.O., and an MRI study, and that there was no support for Dr. Blankfield's mental health notes. (ECF No. 9, PageID #: 945 (citing Exhibits 3F, 5F, and 9F)). Substantial evidence therefore supports the ALJ's finding that the opinion was

unsupported and inconsistent with the record, as well as her decision to withhold controlling weight from the opinion.

The ALJ also provided "good reasons" why she gave the opinion "scant" weight. She noted that Dr. Blankfield's treatment notes were sparse and did not even contain "appropriate physical examinations of all body systems" or detailed explanations of Claimant's trigger points. (ECF No. 9, PageID #: 945). She also appeared to question Dr. Blankfield's ability to recommend physical restrictions as Claimant visited him every three months for medication refills, and the notes were devoid of any functional examinations, tests, or evaluations. (*See* ECF No. 9, PageID #: 945). While Dr. Blankfield opined about Claimant's mental health, the ALJ found that he failed to provide any relevant functional limitations. (ECF No. 9, PageID #: 945). Thus, substantial evidence supports the ALJ's decision to give the opinion "scant" weight.

The ALJ next reviewed Dr. Blankfield's opinion from June 30, 2014 and assigned it "scant weight." (ECF No. 9, PageID #: 945). The ALJ explained that the entire opinion stated, "[Claimant] is unable to work or volunteer 20 hours per week due to his disability. His disability is permanent." (ECF No. 9, PageID #: 945 (citing ECF No. 9, PageID #: 720)). Upon giving the opinion little weight, the ALJ explained that the record was unsupported by the evidence as it did not reference any of Dr. Blankfield's "minimal" findings on physical examinations or any other objective medical evidence. (ECF No. 9, PageID #: 945). The ALJ also noted the opinion was inconsistent with Dr. Blankfield's own previous findings. (ECF No. 9, PageID #: 945). Thus, substantial evidence supports the ALJ's finding that the opinion was unsupported by and inconsistent with the record, as well as the ALJ's decision to withhold controlling weight.

Finally, the ALJ cited other "good reasons" for giving the opinion "scant" weight. She found it was conclusory, failed to explain or cite any records in support of its findings, and

improperly offered a legal conclusion reserved for the Commissioner. (ECF No. 9, PageID #: 945).[5] Accordingly, substantial evidence supports the ALJ's decision to give the opinion "scant" weight.

Claimant also takes issue with the ALJ's treatment of Dr. Blankfield's July 2017 opinion, a letter discussing Claimant's neurological symptoms and prior West Nile Virus diagnosis. (ECF No. 13, PageID #: 1825). In the letter, Dr. Blankfield stated that Claimant's 2001 West Nile Virus diagnosis caused "advancing neurological deterioration" including ataxia, dysphasia, and dysarthria. (ECF No. 9, PageID #: 1682–83). Dr. Blankfield concluded that Claimant "has a long-standing fibromyalgia-like condition that is most likely the result of the West Nile Virus meningitis. The fibromyalgia should have qualified him for disability years ago." (ECF No. 9, PageID #: 1683). The ALJ gave the letter "scant" weight overall but gave the statement about West Nile Virus causing neurological symptoms no weight. (ECF No. 9, PageID #: 947). Claimant appears to challenge this finding primarily because the ALJ dismissed the effects of Claimant's West Nile Virus. (*See* ECF No. 13, PageID #: 1825–26). The Court addresses the ALJ's review of Claimant's West Nile Virus below in its final section.

To the extent Claimant challenges the ALJ's decision affording this opinion "scant" weight, this argument fails as the ALJ adequately explained her finding. She first found the letter unsupported by the record as it was issued without any comprehensive physical evaluations in

---

[5] Disability determinations are the ALJ's responsibility. *See* § 404.1527(d)(1). Therefore, it is improper for a treating source to give a disability determination in their medical opinion. *See O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x. 409, 417 (6th Cir. 2020) ("[A]n ALJ may 'reasonably [give] no weight to [a treating physician's] opinion because [the] conclusion that [the claimant] is totally disabled is a determination reserved to the Commissioner.'") (quoting *Cosma v. Comm'r of Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016)); *see also Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (explaining that even treating sources cannot offer proper disability findings).

Dr. Blankfield's records. (ECF No. 9, PageID #: 946–47 (citing Exhibits 5F, 11F, 12F, 14F, 15F, 18F, 21F, 27F, 28F)). The ALJ noted that Dr. Blankfield's recommended limitations were inconsistent with a July 2019 record which demonstrated Claimant's "normal" movement and sensations in his upper and lower extremities, despite multiple trigger points. (ECF No. 9, PageID #: 947 (citing ECF No. 9, PageID #: 1725)). Further, the ALJ specifically found Dr. Blankfield's conclusions that Claimant's "fibromyalgia should have qualified him for disability years ago," and his alleged neurological symptoms render him "unable to work," unsupported and inconsistent with the record, specifically his own 2018 and 2019 treatment records. (ECF No. 9, PageID #: 947 (citing Exhibits 27F, 28F)). These records indicate "normal" neurological, cardiovascular, and psychological health, and there are no indications of any debilitating conditions that would totally preclude Claimant from work. (*See* ECF No. 9, PageID #: 1725, 1732, 1734, 1736, 1738). She also found the opinion unsupported by and inconsistent with neurological findings from Dr. Gostkowski and Dr. Suresh Kumar, M.D. (ECF No. 9, PageID #: 947). For example, the ALJ noted that Dr. Gostkowski recommended no "significant limitations" and did not find that West Nile Virus contributed to any of Claimant's symptoms during the period at issue. (ECF No. 9, PageID #: 947 (citing ECF No. 9, PageID #: 502–06, 508–12)). Likewise, the ALJ pointed out that Dr. Kumar noted Claimant's tremor, chronic pain, and imbalance but did not link these symptoms to West Nile Virus, as Dr. Blankfield had. (ECF No. 9, PageID #: 947). Thus, substantial evidence supports the ALJ's finding that the opinion was unsupported by and inconsistent with the record, as well as the ALJ's decision to withhold controlling weight from the opinion.

The ALJ gave additional "good reasons" for giving the opinion "scant" weight. She noted that Dr. Blankfield did not specialize in infectious diseases, neurology, or rheumatology and that

the West Nile Virus diagnosis dated back fifteen years. (ECF No. 9, PageID #: 947). The fact

that Dr. Gostkowski and Dr. Kumar, two neurologists, failed to link West Nile Virus to

Claimant's alleged neurological symptoms also contributed to the ALJ's decision to discount the

opinion. (ECF No. 9, PageID #: 947). Moreover, the ALJ pointed out that treatment records from

Dr. Juguilon during this time did not recommend any functional limitations from West Nile

Virus. (ECF No. 9, PageID #: 947 (citing Exhibits 4F, 13F, 17F)). The Court therefore finds that

substantial evidence supports the ALJ's decision to give the opinion "scant" weight.

Claimant finally challenges the ALJ's treatment of Dr. Blankfield's 2021 letter. (ECF No.

13, PageID #: 1825–26). He writes, "[t]he ALJ addresses this opinion, but again cites to much

earlier evidence to undermine Dr. Blankfield's opinion." (ECF No. 13, PageID #: 1826).

The ALJ summarized this letter in her opinion:

> Finally, Dr. Blankfield submitted a letter dated March 25, 2021
> (33F). The letter is addressed to the claimant's representative and
> states that the claimant's "condition is analogous to Long Haul
> Covid-19 that afflicts many individuals who survive Covid-19"
> (33F). He goes on to state that "since contracting West Nile
> Virus in 2001, Mr. Turner has, in essence, Long Haul West Nile
> Virus" explaining the claimant "has chronic body aches, chronic
> fatigue, impaired balance that interferes with his ability to stand,
> exercise intolerance, a tremor that interferes with his ability to use
> silverware or drink from a cup, impaired concentration, and brain
> fog that interferes with his ability to find words to express himself"
> (33F/1). He concludes by opining that the claimant "is permanently
> disabled due to Long Haul West Nile Virus" (33F/1).

(ECF No. 9, PageID #: 947). She gave the opinion "scant" weight as it was unsupported by the

record, specifically, treatment notes from Dr. Juguilon, Dr. Kumar, and Dr. Gostkowski. (ECF

No. 9, PageID #: 948). The ALJ also noted several points of inconsistency between Dr.

Blankfield's finding of permanent disability and the record, though she did not explicitly use the

word "inconsistency." She noted that Dr. Kumar listed other causes of Claimant's neurological

symptoms. (ECF No. 9, PageID #: 948). The ALJ's earlier analysis shows that these factors included Claimant's medications, not West Nile Virus. (*See* ECF No. 9, PageID #: 937).[6] The ALJ also found that records demonstrating Claimant's 5/5 strength contradicted Dr. Blankfield's conclusion of Claimant's permanent disability. (ECF No. 9, PageID #: 948). Thus, as the ALJ properly explained that the opinion was unsupported and inconsistent with the record, substantial evidence supports her decision not to give it controlling weight.

The ALJ also provided "good reasons" to give the opinion "scant" weight. She again noted that Dr. Blankfield was not a specialist in neurology, infectious disease, or rheumatology. (ECF No. 9, PageID #: 947). Thus, the ALJ found he was not qualified to "look at laboratory or diagnostic studies to be able to draw such a conclusion reliably—especially 15 years after the exposure and after two neurologists failed to make that conclusion." (ECF No. 9, PageID #: 948). The opinion was also conclusory, the ALJ found, and reached a disability finding that is reserved for the Commissioner. (ECF No. 9, PageID #: 948); *see* § 404.1527(d)(1). Thus, substantial evidence supports the ALJ's decision to give Dr. Blankfield's 2021 opinion "scant" weight.

Accordingly, the ALJ properly considered the opinions of Dr. Blankfield, and substantial evidence supports her decision to give these opinions "scant" weight. The Court notes that Claimant argues that the ALJ only considered or overly considered supportability when evaluating these opinions and failed to consider other factors. (*See* ECF No. 13, PageID #: 1823;

---

[6] As Dr. Kumar made these observations in 2019, Claimant's argument the ALJ "cites to much earlier evidence to undermine Dr. Blankfield's [2021] opinion" fails. (*See* ECF No. 13, PageID #: 1826; ECF No. 16, PageID #: 1862). While the ALJ cites to previous records from Dr. Juguilon and Dr. Gostkowski as well, these records are relevant to the inquiry because Claimant—and Dr. Blankfield—argued that Claimant suffered from West Nile Virus from 2001 through the date last insured. Thus, opinions from 2013 and 2014 are also relevant to the ALJ's analysis.

ECF No. 16, PageID #: 1859). The Court disagrees. The ALJ need not discuss each factor, so long as the ALJ's decision thoroughly explains their opinion. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis."); *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 195 (6th Cir. 2020) ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor; [she] need only provide 'good reasons' for both [her] decision not to afford the physician's opinion controlling weight and for [her] ultimate weighing of the opinion.").

Moreover, contrary to Claimant's assertion, the ALJ also addressed Dr. Blankfield's treating relationship with Claimant. She noted that Dr. Blankfield "had been treating [Claimant] in his Family Practice since December 17, 1998" in her evaluation of his first opinion dated May 23, 2014. (ECF No. 9, PageID #: 944). The ALJ also noted that Dr. Blankfield was a "treating source" earlier in her review of his opinions, and she repeatedly referenced Claimant's regular visits to Dr. Blankfield's office. (*See* ECF No. 9, PageID #: 935, 937, 943). Read as a whole, the ALJ's decision clearly noted the nature of Dr. Blankfield's treating relationship with Claimant. Likewise, the ALJ also addressed the inconsistencies in the opinions, as is mentioned numerous times above, despite Claimant's argument to the contrary. (*See* ECF No. 13, PageID #: 1823; ECF No. 16, PageID #: 1859).

After reviewing the ALJ's findings, it is clear she followed § 404.1527 and that substantial evidence supports her findings of Dr. Blankfield's opinions. Accordingly, the Court finds no reason to disturb the ALJ's decision to assign Dr. Blankfield's opinions "scant" weight.

### b. Dr. Juguilon

26

Claimant also challenges the ALJ's decision to withhold controlling weight from Dr. Juguilon's 2014 opinions. (*See* ECF No. 13, PageID #: 1821). In her opinion, the ALJ noted that Dr. Juguilon was a "treating source[]" who had been treating Claimant in her family practice for fibromyalgia and chronic pain since September 12, 2013. (ECF No. 9, PageID #: 943 (citing ECF No. 9, PageID #: 619)). However, she ultimately gave "little weight" to Dr. Juguilon's May 22, 2014 opinion, entitled "Medical Course Statement: Physical Abilities and Limitations." (ECF No. 9, PageID #: 943–44).

The ALJ summarized Dr. Juguilon's May 2014 recommendations in her decision:

> On the form Dr. Juguilon opined the claimant had difficulty standing/walking because "of compression fractures of thoracic spine" and "slipped cervical disks" and opined the claimant could stand/walk for 15 minutes at one time and up to 1.5 hours total in an 8-hour workday with intermittent breaks (8F/1). Dr. Juguilon also opined the claimant could sit for 30 minutes at one time and sit for 4 hours total in an 8-hour period with intermittent breaks, and stated the claimant had to shift position every 30 minutes (8F/1). Dr. Juguilon went on to opine the claimant could only lift and carry 10 pounds occasionally and one pound frequently, citing weakness of left arm and hand. However, she also opined the claimant had no difficulty with fingering or fine manipulation, and stated he had trouble turning and opening the lid of a bottle if it was closed tight, but otherwise he had no difficulty with handling "(seize/hold/grasp/turn with hands)" (8F/1-2). Dr. Juguilon did not answer the question regarding difficulty with "reaching" but included a handwritten note "as long as it doesn't involve bending the torso" (8F/2). She indicated the claimant could work 0 hours on a "typical day" and explained her reasoning that he is on pain medication patches for muscle and joint pains (8F/2). She further indicated, in response to a question, that the claimant would likely have absences from work due to "pain (joint and muscle) and fatigue, dizziness with postural changes" (8F/2).

(ECF No. 9, PageID #: 943). The ALJ gave the opinion little weight. (ECF No. 9, PageID #: 943).

The ALJ first noted several instances where Dr. Juguilon's opinion was unsupported by the record. She found that Dr. Juguilon's opinion was in a pre-printed form and failed to cite record support for her limitations. (ECF No. 9, PageID #: 943–44). Instead, the ALJ observed that the physician justified her standing and walking restrictions with "generic[]" rationale such as "compression fracture" and "slipped disc," which were unsupported by Claimant's MRI results. (ECF No. 9, PageID #: 944 (citing ECF No. 9, PageID #: 591–95)). The ALJ found that the MRI instead demonstrated "only mild degenerative disc disease . . . no nerve impingement, no stenosis, and mild compression deformities." (ECF No. 9, PageID #: 944 (referencing ECF No. 9, PageID #: 591–95)). Paired with a record indicating that Claimant had 4/5 strength in his lower extremities, the ALJ found Dr. Juguilon's standing and walking restrictions unsupported by the record. (ECF No. 9, PageID #: 944).

The ALJ also found that Dr. Juguilon's limitations regarding Claimant's ability to sit and change positions lacked support. (ECF No. 9, PageID #: 944). She noted that Dr. Juguilon provided no citations or support from the record to back these recommendations. (ECF No. 9, PageID #: 944). Further, the ALJ found the recommendations "vague" as they simply recommended Claimant "shift position every 30 minutes" and did not indicate whether this included shifting in his seat, standing, or moving around. (ECF No. 9, PageID #: 944 (citing ECF No. 9, PageID #: 618)).

The ALJ then turned to Dr. Juguilon's lifting and carrying restrictions and noted that she failed to support these limitations with diagnostic findings from the record. (ECF No. 9, PageID #: 944). Instead, her justification for the restrictions was "weakness of left arm and hand" which the ALJ found unquantifiable and unsupported by other records. (ECF No. 9, PageID #: 944). The ALJ also noted that any weakness was inconsistent with other findings in the record and that

the state agency medical consultative examiner did not find "significant deterioration in strength or range of motion" to support these limitations. (ECF No. 9, PageID #: 944 (citing Exhibits 7F, 8F)). The ALJ also noted that Dr. Juguilon's opinion that Claimant could not open a bottle lid had no documentation or support. (ECF No. 9, PageID #: 944).

After explaining why Dr. Juguilon's opinion was unsupported by the record, the ALJ also noted that the opinion was inconsistent with other evidence. (ECF No. 9, PageID #: 944). While Dr. Juguilon opined that Claimant could not work because of his pain medications, the ALJ noted that Dr. Gostkowski, a neurologist, reported "normal" neurological examination with only features of pain. (ECF No. 9, PageID #: 944 (citing ECF No. 9, PageID #: 502–10)). She also noted that the MRI showed "no more than minimal changes." (ECF No. 9, PageID #: 944 (ECF No. 9, PageID #: 591–92)). As the ALJ properly explained why the opinion was unsupported by and inconsistent with the record, substantial evidence supports her decision to withhold controlling weight.

The ALJ also provided an additional "good reason" for giving the opinion little weight. She noted that Dr. Juguilon's specialty was family medicine, not neurology or a related practice area. (ECF No. 9, PageID #: 944). Thus, the ALJ found that Dr. Juguilon's opinions regarding Claimant's limitations, especially related to his neurological health, should be given little weight. Based on the ALJ's review of the supportability and consistency of the opinion, as well as other reasons including Dr. Juguilon's specialty, the Court finds that substantial evidence supports the ALJ's decision to give the opinion little weight.

Claimant also challenges the ALJ's decision to withhold controlling weight from Dr. Juguilon's March 6, 2014 opinion. The ALJ noted that Dr. Juguilon opined that Claimant "is not able to perform any type of sustained activity" due to symptoms of dizziness, low energy and

29

stamina, and joint and muscle pain. (ECF No. 9, PageID #: 944 (citing ECF No. 9, PageID #: 531)). The ALJ assigned this opinion no weight since she found it to be conclusory and an improper work determination reserved for the Commissioner. (ECF No. 9, PageID #: 944). The ALJ finally noted that Dr. Gostkowski's findings contradicted the restrictions. (ECF No. 9, PageID #: 944 (citing ECF No. 9, PageID #: 502–06)).

The Court agrees that the opinion is conclusory and makes a finding that is reserved for the Commissioner. *See* § 404.1527(d)(1). Further, substantial evidence supports the ALJ's conclusion that this opinion is inconsistent with Dr. Gostkowski's findings. Thus, substantial evidence supports the ALJ's determination to give the opinion no weight.

Again, the Court notes that Claimant attempts to argue that the ALJ overly relied on supportability and did not address other factors, such as treatment relationship and consistency. (ECF No. 13, PageID #: 1822–23). As noted above, a well-explained opinion does not warrant remand simply because it does not perfectly explain each § 404.1527 factor. *See Francis*, 414 F. App'x at 804; *Rottmann*, 817 F. App'x at 195. Furthermore, Claimant's argument is incorrect. The ALJ stated that Dr. Juguilon was a treating source who began treating Claimant in September 2013. (ECF No. 9, PageID #: 943). Further, the ALJ noted inconsistencies between Dr. Juguilon's recommendations and the record, including MRI results and neurology records that conflicted with Dr. Juguilon's opinion. (ECF No. 9, PageID #: 944).

Accordingly, the Court finds no reason to reject the ALJ's decision to give little and no weight to Dr. Juguilon's opinions. As the ALJ followed § 404.1527, and substantial evidence supports her findings, the Court will not disturb the decision.[7]

---

[7] Claimant also takes issue with the opinions of the state agency physicians, arguing they did not identify fibromyalgia as a severe impairment and gave no weight to the treating

**2. The ALJ did not err in her consideration of Claimant's fibromyalgia and its symptoms**

Claimant next argues that the ALJ failed to consider his subjective complaints related to fibromyalgia. (ECF No. 13, PageID #: 1828, 1830, 1832). The Commissioner argues that substantial evidence supports the ALJ's finding. (ECF No. 15, PageID #: 1854).

The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of HHS*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. § 404.1529(c); SSR 16-3p, 2017 WL 5180304. Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider. The ALJ need not analyze all seven factors but should show that she considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

"[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3P, 2017 WL 5180304. The ALJ's "decision

---

physicians' opinions. (*See* ECF No. 13, PageID #: 1824). However, because the Court is only reviewing what Claimant raised as an error, any argument surrounding the consultants' opinion is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248–49), *report and recommendation adopted by* No. 3:18-cv-1639, 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

The ALJ specified Claimant's subjective complaints in her decision, including pain:

> The claimant alleges that he cannot sustain full time employment due to a combination of symptoms from his impairments including fibromyalgia, chronic fatigue, compression fractures in spine; cervical, thoracic, and lumbar degeneration in back; and chronic back pain (4E; 6E; hearing testimony). He testified in hearings that he is unable to work due to his ambulatory difficulties, his tremor, and difficulty with short-term memory (hearing testimony). He testified that his back pain has gotten progressively worse with time, and that his symptoms from asthma have also worsened with time (hearing testimony). The claimant reported that he stopped working due to breathing difficulties, mobility issues, and joint and back pain. He testified that he spends most of his time in a recliner with his feet elevated at home to get relief from back and joint pains (hearing testimony).
>
> Notably, the claimant testified at a prior hearing in 2019 that he did not follow up about getting insurance through other means or resources since the last hearing in this matter (hearing testimony). He testified he had heard about MetroHealth Institution, but had not attempted to talk to anyone about pursuing low- cost medical care or treatment since the prior hearings (hearing testimony). He also testified previously that he had medical insurance coverage through his wife's employer, and that he had a period of coverage through her previous employer as well (hearing testimony).

> Further, he testified that at one point he had coverage with
> Medicaid through help from Lorain County Job and Family
> Services, but then was no longer covered due to household income
> being too high (hearing testimony). After that point, the claimant
> testified that he did not seek assistance for healthcare coverage,
> insurance, or low cost providers from other sources (hearing
> testimony). . . . The claimant reported hand tremors, explaining
> that he occasionally spilled food and drink on himself (18F/29;
> hearing testimony).

(ECF No. 9, PageID #: 933, 940). Next, the ALJ provided a unified statement of reasons for

discounting the severity of Claimant's allegations related to fibromyalgia and its symptoms:

> As noted above, the claimant has been diagnosed with
> fibromyalgia, and as required by SSR 12- 2p, an examination from
> September 2013 revealed 16/18 positive tender points (4F/11-13).
> This appears to be the only examination that documents the
> presence, number and location of trigger points for a fibromyalgia
> analysis and diagnosis. Other examinations have not yielded
> evidence of the required positive tender points, and the record is
> absent evidence that other disorders that could cause the symptoms
> or signs, such as obesity, were excluded (1F, 2F, 3F, 4F, 5F, 7F,
> 9F, 11F, 12F, 13F, 15F, 17F, 18F, 20F; 21F; 23F; 27F; 28F; 29F).
> Despite the reports and repeated notations in the records from Dr.
> Blankfield, after the exam from September 2013, he failed to
> document any specific physical exam findings noting the number
> and location of the positive tenderpoints (sic). Instead, he routinely
> and vaguely wrote: "multiple trigger points." Given the limited
> fibromyalgia related evidence of record, the undersigned finds the
> claimant's fibromyalgia is a severe physical impairment, but the
> pain and other symptoms related to fibromyalgia do not prevent
> him from performing the reduced demands of light work set forth
> above.

(ECF No. 9, PageID #: 938–39).

Throughout her opinion, the ALJ noted Claimant's medications and side effects,

"conservative treatment," and the objective and subjective medical evidence. Claimant

challenges the ALJ's reliance on these factors, and the Court will review each claim below.

### a.  Side effects of medication

Claimant argues that the ALJ "ignored side effects of medication because she did not believe that [Claimant] needed the medication his doctor prescribed." (ECF No. 13, PageID #: 1833). Specifically, he refers to the ALJ's review of his use of fentanyl patches, which Dr. Blankfield prescribed to combat Claimant's fibromyalgia pain and increase functionality. (ECF No. 13, PageID #: 1828–30). Notably, Dr. Gostkowski recommended Claimant discontinue this prescription, and Dr. Kumar found that the fentanyl may cause or contribute to Claimant's reported imbalance. (*See* ECF 9, PageID #: 505, 1748). Claimant first argues that the ALJ "played doctor" by questioning Claimant about his use of fentanyl patches and "demanded that counsel justify the treating physician's prescription for continued use of a fentanyl patch." (ECF No. 13, PageID #: 1829–30; ECF No. 16, PageID #: 1864). He argues the ALJ failed to account for the side of effects of the patches in her RFC and "relied on vague extra-record evidence" to improperly criticize Dr. Blankfield's prescription. (ECF No. 13, PageID #: 1829; ECF No. 16, PageID #: 1864). The Commissioner responds that the ALJ was simply resolving a conflict in the record between Dr. Blankfield's prescription and Dr. Gostkowski's recommendation that Claimant discontinue the patches. (ECF No. 15, PageID #: 1853).

Claimant's argument fails. The ALJ did account for the side effects of Claimant's prescriptions, including fentanyl, as she restricted Claimant to "frequent[] balancing" in the RFC. (*See* ECF No. 9, PageID #: 932). Substantial evidence supports this restriction as the state agency consultants recommended frequent balancing, and no expert recommended a more restrictive limitation to account for this side effect. (*See* ECF No. 9, PageID #: 130, 145). Additionally, Claimant has the burden of proving the restriction was inapt, but he has failed to suggest any additional restrictions the ALJ should have adopted in place of this restriction. He cites no

additional records the ALJ did not consider in her review of the record. Thus, substantial evidence supports the ALJ's RFC restriction.[8]

Further, the ALJ did not err in discussing the fentanyl prescription at the administrative hearing or "play doctor" as Claimant suggests. The ALJ has a duty to develop the record during a hearing, and here, she was discussing the fentanyl patches because Dr. Kumar noted they could cause some of the neurological symptoms Claimant alleged, such as imbalance. (*See* ECF No. 9, PageID #: 994). Further, the ALJ noted in her decision that while Dr. Blankfield prescribed the patches for fibromyalgia symptoms, Dr. Gostkowski recommended Claimant discontinue use. (ECF No. 9, PageID #: 934 (citing ECF No. 9, PageID #: 502–06)). In fact, Dr. Gostkowski wrote, "I would strongly recommend he discontinue the Fentanyl patches" and recommended other medications. (ECF No. 9, PageID #: 505). Claimant does not challenge the ALJ's reliance on the treatment notes of Dr. Gostkowski or Dr. Kumar. Thus, the ALJ did not err in her consideration of this issue in her analysis.

### b. Objective evidence of fibromyalgia and pain

Claimant next argues that the ALJ "required objective evidence of pain despite [his] fibromyalgia." (ECF No. 13, PageID #: 1833). He claims the ALJ improperly "downgraded [his] experience of pain and other symptoms because all examinations did not record 16/18 tender points of fibromyalgia . . . ." (ECF No. 13, PageID #: 1830). He claims fibromyalgia manifests in other ways and that the severity of his fibromyalgia should not be determined by objective evidence alone. (ECF No. 13, PageID #: 1830–31 (citing SSR 12-2p)). Claimant also argues that the ALJ failed to explain how she accounted for fibromyalgia in the RFC and did not include any

---

[8] To the extent Claimant argues the ALJ did not account for his side effects from other medications, this argument fails. Claimant has waived any argument related to the other medications for failure to fully brief the issue. *See McPherson*, 125 F.3d at 995–96.

expert opinions in support of her overall conclusion discrediting his testimony. (*See* ECF No. 13, PageID #: 1823–24). The Commissioner responds that substantial evidence supports the ALJ's finding related to Claimant's fibromyalgia and its severity. (ECF No. 15, PageID #: 1851).

SSR 12-2p establishes special rules for how ALJs evaluate whether fibromyalgia is a severe impairment at Step Two and claimants' fibromyalgia symptoms at Step Three. SSR 12-2p, 2012 WL 3104869 at *3, 4–6. ALJs must evaluate a person's statements about his or her symptoms and functional limitations by using a two-step method set forth in the regulations and in SSR 16-3p.[9] *Id.* First, the ALJ must determine whether "medical signs and findings that show the person has [a medically determinable impairment(s)] which could reasonably be expected to produce the pain or other symptoms alleged," recognizing that a fibromyalgia diagnosis "satisfies the first step of our two-step process for evaluating symptoms." *Id.* Second, SSR 12-2p specifically allows the ALJ to consider whether "objective medical evidence . . . substantiate[s] the person's statements about the intensity, persistence, and functionally limiting effects of symptoms." *Id.* If not, the ALJ is to consider "all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." *Id.*

As an initial matter, the ALJ found Claimant's fibromyalgia to be a severe impairment at Step Two. (ECF No. 9, PageID #: 927). This is undisputed, and Claimant now challenges the ALJ's ultimate finding that his fibromyalgia symptoms were not as severe as he alleged.

---

[9] Note that SSR 12-2p states ALJs should review claimants' subjective complaints based on "SSR 96-7p." However, this ruling was superseded by SSR 16-3p on March 28, 2016.

The ALJ discussed Claimant's treatment for fibromyalgia and its symptoms at length. (*See* ECF No. 9, PageID #: 934–38). She noted that Dr. Juguilon diagnosed Claimant with fibromyalgia in September 2013 and conducted a trigger point test, finding 16/18 positive tender points. (ECF No. 9, PageID #: 935 (citing ECF No. 9, PageID #: 539), 936). The ALJ pointed out that Claimant continued treatment with Dr. Juguilon from October 2013 through July 2015 and attended regular three-month appointments throughout 2018, 2019, and 2020 for pain and other fibromyalgia symptoms with Dr. Blankfield. (ECF No. 9, PageID #: 935 (citing Exhibits 5F, 11F, 18F, 23F, 27F, 28F)). Dr. Blankfield prescribed fentanyl patches and Celebrex for Claimant's pain, and the ALJ noted several issues with his treatment notes.[10] (ECF No. 9, PageID #: 935 (citing Exhibits 18F, 21F, 23F, 27F, 28F)). The ALJ also listed Claimant's 4/5 and 5/5 grip strength test results, as well as "normal" sensation and movement in the upper and lower extremities. (ECF No. 9, PageID #: 936–37). The ALJ referenced Claimant's pain injections throughout 2013 and visits with Dr. Tran, where Claimant reported his history of fibromyalgia. (ECF No. 9, PageID #: 935, 939–40). Notably, the ALJ found that Dr. Juguilon was the only physician to conduct a trigger point test. (ECF No. 9, PageID #: 936).

---

[10] First, the ALJ found that the records did not include any "detailed physical examination" and instead relied on Dr. Juguilon's 2013 trigger point test. (ECF No. 9, PageID #: 936 (citing Exhibits 5F, 11F, 18F, 21F, 23F, 27F, 28F)). She was concerned that Dr. Blankfield did not perform his own trigger point test to confirm Dr. Juguilon's findings, and she found that Dr. Blankfield's records "do not further explain, detail, or specifically note the testing or which trigger points were involved" in his examinations. (ECF No. 9, PageID #: 936 (citing ECF No. 9, PageID #: 1719, 1725, 1740)). The ALJ also noted that Dr. Blankfield's "sparse office visit notes and minimal documentation of clinical findings fail to include an analysis or evaluation of the claimant's response to treatment or potential improvement in the number or location of 'signs' of fibromyalgia." (ECF No. 9, PageID #: 936). The ALJ found they also failed to discuss fibromyalgia-related assessments measuring range of motion, strength, sensation, and straight leg raises. (ECF No. 9, PageID #: 936 (citing Exhibits 5F, 11F, 18F, 21F, 23F, 27F, 28F)).

Claimant challenges the ALJ's emphasis on the single trigger point test. He argues the ALJ improperly focused on "the lack of testing for fibromyalgia tender points" in her review and alleges that the ALJ failed to explain how this correlated with "a less severe experience of fibromyalgia symptoms." (*See* ECF No. 13, PageID #: 1830–31). But Claimant mischaracterizes the ALJ's reasoning. The ALJ did not find that the absence of trigger point evaluations demonstrated less severe fibromyalgia symptoms per se; rather, she questioned other providers' reliance on Dr. Juguilon's trigger point test in lieu of conducting physical examinations themselves. For example, she noted that Dr. Blankfield made fibromyalgia treatment recommendations based off this one trigger point test but failed to conduct "any detailed physical examination documenting an assessment of all the claimant's symptoms or specific reference to a trigger point examination." (ECF No. 9, PageID #: 936). She also noted that "there is no indication that Dr. Blankfield performed testing to confirm the specific trigger points." (ECF No. 9, PageID #: 936). Thus, Claimant's argument is misplaced.

Furthermore, the ALJ also considered several SSR 16-3p factors. Throughout her opinion, the ALJ discussed the medications Claimant took to minimize his pain, including fentanyl patches and Celebrex. (ECF No. 9, PageID #: 935, 937). She noted that Claimant used fentanyl patches every three days to mitigate fibromyalgia pain and increase functionality. (ECF No. 9, PageID #: 935 (citing Exhibits 18F, 21F, 27F, 28F)). The ALJ also discussed, albeit briefly, Claimant's daily activities such as his testimony that he "spends most of his time in a recliner with his feet elevated at home to get relief from back and joint pains" and did things around the house. (ECF No. 9, PageID #: 933, 939). Throughout her RFC analysis, the ALJ referred to the fibromyalgia treatment Claimant pursued including pain injection appointments

and regular outpatient appointments with Dr. Juguilon and Dr. Blankfield. (ECF No. 9, PageID #: 934, 935, 937).

These factors led the ALJ to discount the severity of Claimant's fibromyalgia symptoms. (*See* ECF No. 9, PageID #: 938–39). While Claimant is correct in noting that ALJs must consider factors beyond objective tests since fibromyalgia is largely a subjective condition, the ALJ here examined other factors that led to her conclusion. *See Rogers*, 486 F.3d at 243 ("[F]ibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs."). The ALJ of course noted that Claimant tested positive for 16/18 tender points but found that other doctors failed to conduct their own tests or record the location or number of trigger points. (*See* ECF No. 9, PageID #: 938). Instead, sources including Dr. Blankfield wrote "vague" notes such as "multiple trigger points" and failed to evaluate if other conditions caused Claimant's symptoms. (ECF No. 9, PageID #: 938). These records failed to establish severe fibromyalgia symptoms because they simply did not contain enough information about Claimant's condition. (*See* ECF No. 9, PageID #: 938). Elsewhere in the record, the ALJ noted that while Claimant used fentanyl patches to mitigate fibromyalgia symptoms, Dr. Gostkowski recommended Claimant discontinue the patches. (ECF No. 9, PageID #: 934, 935). Further, since no doctor discussed Claimant's improvement or response to treatment over time, the ALJ had no idea of Claimant's progress, another factor courts have considered in determining the severity of fibromyalgia. (ECF No. 9, PageID #: 936); *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 807 (6th Cir. 2008) ("Unlike in *Rogers* where claimant's fibromyalgia symptoms progressively worsened, Vance's symptoms have either improved or remained stable."). Finally, the ALJ noted that Claimant had no record of inpatient treatment, emergency medical visits, or repeated hospitalizations that are

characteristic of severe and disabling symptoms. (*See* ECF No. 9, PageID #: 941). For these reasons, substantial evidence supports the ALJ's decision to discredit the extent of Claimant's testimony and disproves Claimant's argument that the ALJ completely relied on objective evidence in reaching her conclusion.

The ALJ's decision satisfies the Court that she considered all of the relevant evidence and that a reasonable mind might accept that evidence as adequate to support the ALJ's credibility finding. There exists, therefore, no compelling reason for the Court to disturb that finding. *Cross*, 373 F. Supp. 2d at 732

The Court finally notes that Claimant's argument that the ALJ's finding "provides no insight into how fibromyalgia factored into the analysis of the [RFC]" fails. (*See* ECF No. 13, PageID #: 1833). The ALJ's discussion of fibromyalgia throughout her decision, as well as an explicit note listing Claimant's fibromyalgia as a reason for adopting a light RFC, adequately illustrates how fibromyalgia and its symptoms factor into the RFC. (*See* ECF No. 9, PageID #: 949).[11] Further, Claimant suggests no additional functional limitations or records the ALJ failed to consider in her finding or how she may have violated SSR 12-2p.

### c. Conservative treatment

Claimant argues that the ALJ improperly "required [him to] 'exhaust' all treatment options even though [he] testified on several occasions to his financial difficulty in obtaining such treatment." (ECF No. 9, PageID #: 1833). He claims the ALJ failed to address his limited access to insurance or explain how additional treatment would have improved his condition.

---

[11] Claimant's argument that the ALJ failed to support her finding with an expert opinion also fails. ALJs have authority to determine the RFC and other relevant determinations in disability cases. *See* § 404.1520(a)(4)(i)–(v). Thus, they are not required to find expert opinions that perfectly match their findings or RFC determinations.

(ECF No. 13, PageID #: 1831–32). The Commissioner argues that conservative treatment is a valid consideration factor in evaluating subjective complaints. (ECF No. 15, PageID #: 1852 (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 419 (6th Cir. 2011); *Tweedle v. Comm'r of Soc. Sec.*, 731 F. App'x 506, 508 (6th Cir. 2018))). The Commissioner points out that the ALJ did consider Claimant's insurance access and acknowledged times when Claimant was uninsured. (ECF No. 15, PageID #: 1852).

The Court agrees with the Commissioner—the degree of treatment a claimant pursued is relevant to an ALJ's inquiry. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) ("The ALJ noted that the records indicate Kepke received only conservative treatment for her ailments, a fact which constitutes a 'good reason' for discounting a treating source opinion."); *see also Laney v. Comm'r of Soc. Sec.*, No. 5:21-CV-01290-CEH, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) ("A conservative treatment history is a reason to conclude more extreme limitations are not necessary."). Thus, the ALJ did not err in considering this factor.

Moreover, the ALJ discussed Claimant's insurance coverage, and lack of coverage, throughout the record. (*See* ECF No. 9, PageID #: 933). First, she summarized Claimant's testimony about health insurance:

> [Claimant] testified at a prior hearing in 2019 that he did not follow up about getting insurance through other means or resources since the last hearing in this matter (hearing testimony). He testified he had heard about MetroHealth Institution, but had not attempted to talk to anyone about pursuing low- cost medical care or treatment since the prior hearings (hearing testimony). He also testified previously that he had medical insurance coverage through his wife's employer, and that he had a period of coverage through her previous employer as well (hearing testimony). Further, he testified that at one point he had coverage with Medicaid through help from Lorain County Job and Family Services, but then was no longer covered due to household income

41

being too high (hearing testimony). After that point, the claimant testified that he did not seek assistance for healthcare coverage, insurance, or low cost providers from other sources (hearing testimony).

(ECF No. 9, PageID #: 933). Later in her decision, the ALJ also noted that:

Dr. Blankfield referred the claimant to neurologists on two occasions, but the claimant did not follow up on these recommendations until July 2019, previously citing financial reasons (29F). However, at the most recent hearing, the claimant testified that he was covered by Medicaid and two subsequent health insurance providers at times during the relevant period (hearing testimony). He also testified that while he had heard of the MetroHealth Institution and sought assistance through Lorain County Jobs and Family Services at one point, he did not seek help, assistance, or low-cost providers for additional treatment options due to his own decision-making (hearing testimony). There is no evidence that the claimant exhausted efforts to find assistance or low-cost health care.

(ECF No. 9, PageID #: 941). The ALJ further noted that Claimant "was discharged prior to successfully achieving therapy goals due to limitations in insurance coverage." (ECF No. 9, PageID #: 934 (citing ECF No. 9, PageID #: 395)). The Court therefore rejects the Claimant's argument that the ALJ did not properly consider his insurance coverage throughout the period at issue.

Further, the ALJ did not conclude Claimant obtained conservative treatment because of lack of insurance coverage. Rather, the ALJ found Claimant's treatment conservative since he managed his symptoms with outpatient office visits, medication management, and "some" injections and physical therapy. (ECF No. 9, PageID #: 940). She also noted that the record did not demonstrate "extensive or repeated hospitalizations [or] emergency room visits related to [Claimant's] severe impairments, invasive procedures, or require[] physician intervention." (ECF No. 9, PageID #: 941). Thus, the ALJ's finding was made independent of Claimant's failure to finish physical therapy or follow Dr. Blankfield's neurological referrals.

The Court finds that substantial evidence supports the ALJ's finding that Claimant pursued conservative treatment options. Accordingly, the Court will not disturb the ALJ's decision.

### 3.  The ALJ properly accounted for Claimant's conditions in the RFC

Claimant finally contends that the ALJ improperly discounted his "post-West Nile Virus" symptoms, ignoring his syndrome and the combined impact of all his impairments. (ECF No. 13, PageID #: 1826, 1832–33). He specifically references Dr. Blankfield's 2021 opinion that claims West Nile Virus caused long-term neurological complications. (ECF No. 9, PageID #: 1797 (opinion); ECF No. 13, PageID #: 1825–26 (Claimant's argument)). The Commissioner claims this argument is wholly inconsistent with the decision, which demonstrates the ALJ spent multiple pages discussing the medical evidence and opinions related to Claimant's West Nile Virus diagnosis. (ECF No. 15, PageID #: 1853). The Commissioner also points out that the ALJ noted that multiple neurologists assigned no limitations related to Claimant's diagnosis and that the only physician to provide related limitations—Dr. Blankfield—did not specialize in infectious diseases, neurology, rheumatology, or a related specialty. (ECF No. 15, PageID #: 1853–54).

At Step Four, the ALJ determined Claimant's RFC. The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* § 416.945(a). Here, the ALJ determined Claimant's RFC as follows:

> [L]ight work as defined in 20 CFR 404.1567(b) except limited to frequently climbing ramps and stairs; frequently balancing, kneeling, and crouching. He must avoid concentrated exposure to extreme cold and heat. The claimant must avoid concentrated exposure to humidity and concentrated exposure to respiratory irritants such as fumes, odors, dusts, gases, and poor ventilation. He must avoid all exposure to hazards such as operating industrial machinery or being around it (such as power-saws and

jackhammers), and working in unprotected heights.

(ECF No. 9, PageID #: 932–33). When supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive—even if this Court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek v. Comm'r of Soc. Sec.,* 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case *de novo*." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen*, 800 F.2d at 545.

Here, the ALJ considered Claimant's history of West Nile Virus in combination with Claimant's other impairments in her RFC. She first mentioned that Claimant reported his West Nile Virus to Dr. Juguilon in September 2013. (ECF No. 9, PageID #: 537–39). She also noted that Dr. Blankfield referred Claimant to two neurologists for his reported tremor and sequela of West Nile Virus. (ECF No. 9, PageID #: 941 (citing ECF No. 9, PageID #: 1745–48)). The ALJ reviewed Dr. Blankfield's opinions on West Nile Virus and afforded "scant" weight to each, as discussed above. (ECF No. 9, PageID #: 946–48).

The ALJ also evaluated the neurological symptoms Claimant alleged are a result of his West Nile Virus. She summarized Claimant's treatment with Dr. Gostkowski, Dr. Basha Alshareef, M.D., and Dr. Kumar, neurologists who examined Claimant for pain, twitching, muscle spasms, tremors, and imbalance, among other symptoms. (ECF No. 9, PageID #: 934, 935, 937). The ALJ noted Dr. Kumar found that some of Claimant's alleged symptoms could have been caused by other sources, rather than the virus. (ECF No. 9, PageID #: 937). He found

that Claimant's imbalance could have been caused by the combination of osteoarthrosis and degenerative joint disease of the spine, as well as medications Claimant took such as gabapentin and fentanyl patches. (ECF No. 9, PageID #: 1748). Indeed, the ALJ noted that Dr. Gostkowski recommended Claimant discontinue use of the fentanyl patches. (ECF No. 9, PageID #: 934). Dr. Kumar also found that Claimant's bupropion and asthma medications could have caused the tremors. (ECF No. 9, PageID #: 1748). Thus, she considered the symptoms Claimant alleges are a result of West Nile Virus in her RFC analysis.

Claimant also argues that the ALJ failed to discuss the fact that Claimant tested positive for the virus during the period at issue and that Dr. Juguilon prescribed an antiviral medication as a result. (ECF No. 13, PageID #: 1826; ECF No. 16, PageID #: 1862–63). However, the ALJ did discuss Dr. Juguilon's antiviral prescription and cited the specific records Claimant references many times throughout her decision. (*See* ECF No. 9, PageID #: 935 ("Dr. Juguilon ordered mitochondrial IV infusions and prescribed Acyclovir.")). Although the ALJ does not reference Claimant's IgM levels, she was not required to discuss every report in the record, and substantial evidence supports her ultimate finding regarding Dr. Blankfield's West Nile Virus opinions. *See Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)); *Jenkins v. Colvin*, No. 5:15-CV-1165, 2016 WL 825909, at *9 (N.D. Ohio Feb. 11, 2016) ("Although an ALJ is required to consider all of the evidence in the record, [s]he is not required to discuss each item of evidence in her opinion." (citations omitted)), *report and recommendation adopted by*, No. 5:15 CV 1165, 2016 WL 815625 (N.D. Ohio Mar. 1, 2016). Thus, the ALJ did not "pick and choose" evidence to discuss in her RFC analysis as Claimant argues. (*See* ECF No. 16, PageID #: 1863).

As mentioned above, Claimant has the burden of proving the ALJ's RFC is inapt. However, he has failed to allege any additional functional limitations to account for his West Nile Virus. The only suggested limitations in the record were those of Dr. Blankfield, concluding Claimant was totally disabled. (*See* ECF No. 9, PageID #: 1682–83, 1797). But these are improper expert conclusions, as discussed above. Claimant's argument accordingly fails.

The Court therefore finds that the ALJ reviewed Claimant's history of West Nile Virus and neurological symptoms in her RFC analysis and that substantial evidence supports the RFC. Accordingly, the Court will not disturb the ALJ's decision.

## VI.    Recommendation

Based on the foregoing, it is RECOMMENDED that the Court AFFIRM the Commissioner of Social Security's nondisability finding.

Dated: February 28, 2023

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530–31 (6th Cir. 2019).