**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| James C. Turner, | ) | CASE NO. 1:22-CV-877 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Commissioner of Social Security, | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendant. | ) | |

**<u>INTRODUCTION</u>**

This matter is before the Court upon the Report and Recommendation of Magistrate

Judge Carmen E. Henderson ("R&R") (Doc. 17) recommending that the decision of the

Commissioner be affirmed.  Plaintiff has filed objections.  For the following reasons, the

R&R is ACCEPTED, and the decision of the Commissioner is AFFIRMED.

**<u>STANDARD OF REVIEW</u>**

When objections are made to a Magistrate Judge's Report and Recommendation, the

district court reviews the case *de novo*.  Federal Rule of Civil Procedure 72(b) provides in

pertinent part:

> The district judge to whom the case is assigned shall make a *de*
> *novo* determination upon the record, or after additional evidence,

1

> of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

As stated in the Advisory Committee Notes, "When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." In *Thomas v. Arn*, 474 U.S. 140, 150 (1985), the Court held, "It does not appear that Congress intended to require district court review of a magistrate judge's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."

**PROCEDURAL HISTORY**

Plaintiff James Turner ("Plaintiff") filed this lawsuit seeking review of the Commissioner's April 26, 2021 decision denying his application for Supplemental Security Income ("SSI").

Turner filed an application for disability benefits in February 2014. In a decision dated April 22, 2016, an ALJ denied Turner's application. The Appeals Council denied his request for review. On September 30, 2016, Turner filed a Complaint in this Court challenging the Commissioner's final decision. By joint stipulation of the parties, in March 2017, the Court remanded the case back to the Commissioner. Pursuant to the March 2017 Order of Remand, the Court directed the ALJ to "reweigh the treating source and examining source opinions, consistent with Social Security's regulations." (Doc. 9, p. 1165).

A new hearing was held in November 2017, and the same ALJ issued a new decision finding Turner was not disabled. Turner appealed the denial of benefits to the Appeals

2

Council, which remanded the case back to the ALJ to "adequately evaluate" opinion evidence in the record and further consider Turner's subjective complaints. (*Id*. at 1168-70).  After another hearing, a new ALJ issued a third decision in November 2019 finding Turner was not disabled.  Turner appealed the denial of benefits to the Appeals Council for a third time, and in November 2020, the Council again remanded the case back to the ALJ, on the basis that the ALJ's decision did not "contain an adequate evaluation of all the treating source opinions in the record," including the opinion of Dr. Blankfield, and contained "no substantive discussion of the claimant's past work." (*Id*. at 1210).

In April 2021, a fourth hearing was held, and two weeks later the second ALJ issued a decision finding Turner was not disabled.  In April 2022, the Appeals Council denied his request for review.  On May 26, 2022, Turner filed a Complaint in this Court challenging the Commissioner's final decision.

**FACTS**

Plaintiff suffers from impairments including mild degenerative disc disease of the lumbar spine; mild anterior wedge vertebral compression deformities at the thoracolumbar junction; fibromyalgia; asthma; obesity; and sleep apnea.  Two of plaintiff's treating physicians opined, respectively, that plaintiff is "permanently disabled" and able to work zero hours in a day.[1] The Administrative Law Judge ("ALJ") rejected these opinions, and, instead relied on other medical record evidence and the opinions of the consultative examining physicians and the state agency physicians in determining plaintiff was not disabled.

---

[1]    One of these physicians, Dr. Blankfield, authored five opinions
       which consistently concluded plaintiff was unable to perform work
       during the period between 2014 - 2021.

3

**ANALYSIS**

Plaintiff objects to the R&R on two grounds.  First he asserts that the ALJ erred in evaluating the opinions of his two treating sources.  Second, he asserts that both the ALJ and the Magistrate Judge erred in the analysis of his pain and other symptoms.  Each objection will be addressed in turn.

      1.      **Treating Source Opinions**

Plaintiff first argues that the ALJ made an error of law in failing to follow the Agency's regulations for the evaluation of treating source opinions.  At the time this claim was filed, Agency regulations required that "an opinion from a medical source who regularly treated the claimant (a 'treating source') be afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source')."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013), *citing* 20 C.F.R. § 404.1502, 404.1527(c)(2).  Under Sixth Circuit law, the opinion of a treating physician is given controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart,* 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

With regard to the element of supportability, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3). Regarding consistency, the regulations state "the more consistent a medical opinion is with the record as

4

a whole, the more weight we will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4).

In the event the ALJ concludes that the medical opinion is unsupported or inconsistent with the other substantial evidence, the opinion may be given less than controlling weight, but should not be rejected.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) (Soc. Sec. Rul. 96  2p).  Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Id.*  In the event the treating physician's opinion is not given controlling weight, the ALJ must determine how much weight is appropriate for the opinion and must consider: (1) the length, frequency, nature, and extent of the treatment relationship; (2) consistency of the physician's conclusions; and (3) any specialization of the treating physician. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.,* 486 F.3d at 243.

Plaintiff's objection focuses on opinions that two of his treating physicians, Dr. Blankfield and Dr. Juguilon, rendered in 2014.[2]  Each of these opinions will be addressed separately.

### A. Opinions of Dr. Blankfield

The Court will first address the two opinions of his long-time primary care physician, Dr. Blankfield.  Plaintiff argues that the ALJ and the Magistrate failed to follow the proper

---

[2]     In his objection, Plaintiff discusses additional opinion evidence in his analysis of the evaluation of his pain and other symptoms.

legal criteria for evaluating his treating source's opinions because they focused only on the

issue of whether the ALJ's conclusions were supported by substantial evidence, and failed to

address the other factors provided in 20 C.F.R. § 404.1527 and 416.927.[3]  Therefore, plaintiff

asserts that the ALJ failed to articulate "good reasons" for discounting Dr. Blankfield's

opinions.

Plaintiff's objection focuses primarily on opinions that Dr. Blankfield authored in

May and June 2014, both of which were accorded "scant weight" by the ALJ.  The first

opinion was submitted on a form entitled "Medical Source Statement: Physical Abilities and

Limitations." (Doc. 9, p. 588-89).  It identified numerous physical limitations, including a

limitation to working one to two hours on a typical day due to "neck, back, shoulder and hip

pain."  (*Id*.).  The second opinion was a terse statement that plaintiff "is unable to work or

volunteer 20 hours per week due to his disability. His disability is permanent." (*Id*. at 686).

The ALJ gave these opinions "scant weight" for the following reasons:

> [The restrictions] are not well supported from the medical evidence (9F).
> Similar to the opinions from Dr. Juigulon (sic) on the same pre-printed form,
> Dr. Blankfield's opinions regarding standing/walking, sitting, lifting/carrying,
> working hours, and work attendance, reference subjectively reported
> symptoms but did not identify specific diagnostic testing[4] or objective findings

---

[3]     The Court notes that plaintiff does not challenge the Magistrate
Judge's finding that the ALJ's conclusions are supported by
substantial evidence.

[4]     Here, the ALJ made an overbroad statement.  Although Dr.
Blankfield's opinion did not specifically reference it, the records
he provided show that he ordered diagnostic testing including
imaging.  However, the results of this testing did not support the
extreme limitations in his opinion.  In contrast, Dr. Juigulon's
initial examination documented specific diagnostic testing that
established the presence of fibromyalgia.  The ALJ was clearly

6

to support limitations offered from the medical evidence or treatment records (8F; 9F; 27F; 32F). Moreover, there are other findings in the record which contradict the limits offered in Dr. Blankfield's opinions, specifically, Dr. Gostkowski noted normal neurological exam findings and the MRI study showed no more than minimal changes (3F/30-38; 5F/30-31; 9F/29-30). Ongoing treatment records from Dr. Blankfield failed to document appropriate physical examinations of all body systems, but simply noted "multiple trigger points of pain" in the thoracolumbar spine and some tenderness in the first CMC joint of the right thumb (27F; 32F). Dr. Blankfield's treatment records of follow up appointments approximately once every three months for medication refills did not document any findings that would suggest he examined, evaluated, tested, and/or concluded the functional status of the claimant for lifting/carrying, walking, range of motion, strength, etc., on a routine basis (27F; 28F; 30F; 32F). With regard to the opinions that the claimant has difficulty concentrating and focusing, there is no objective testing or reference to diagnostic testing to support this statement in Dr. Blankfield's treatment records or the overall evidence of record, and the undersigned notes that Dr. Blankfield does not opine to any specific limitations related to concentration or focus (4F; 5F; 11F; 12F; 13F; 14F; 18F; 21F; 23F; 27F; 28F). Furthermore, the opinion that the claimant would be absent more than 4 days per month is not supported by any reference to treatment or medical records and is not consistent with the overall evidence.

(Doc. 9, p. 911).

As the Magistrate Judge noted, this explanation addresses the two most critical elements of the multi factor analysis set forth in the regulations: supportability and consistency.  First, the ALJ explains that Dr. Blankfield's opinion is not supported by his own treatment records, which "failed to document appropriate physical examinations of all body systems," because they "were generally limited to blood pressure, height, and weight, but did not generally note areas that would be expected for assessment of impairments of fibromyalgia and degenerative disc disease, such as range of motion, strength, sensation, or

---

aware of this testing, as she discussed it in detail earlier in her decision and cited it as the basis for finding fibromyalgia was a severe impairment.  Therefore, the Court believes the poorly chosen language in this sentence does not reflect a material error in the ALJ's analysis of the record.

straight leg raise tests," and "fail to include an analysis or evaluation of the claimant's response to treatment or potential improvement in the number or location of signs of fibromyalgia."  (*Id*. at 902, 911).  For example, the June 2014 visit note reports states, "He has fibromyalgia. The cyclobenzaprine makes his mouth dry."  (*Id*. at 675).  Therefore, the ALJ determined Dr. Blankfield's treatment notes "did not include testing that would provide a basis for the physical limitations in his opinion." (*Id*. at 911).  This neither states nor implies the ALJ was unaware that Dr. Blankfield provided diagnostic testing.

Second, the ALJ explained that Dr. Blankfield's opinion was not consistent with other record evidence, specifically the MRI results and Dr. Gostkowski's neurological exam findings,[5] as well as the findings of consultative examiner Dr. Tran, who performed a functional evaluation.[6]  The ALJ detailed both the "length and frequency" and the "nature and extent" of Plaintiff's treating relationship with Dr. Blankfield.  She noted that "Dr. Blankfield stated in the form that he has been treating Claimant since December 17, 1998," and explained treatment records showed Dr. Blankfield treated Plaintiff "once every three months

---

[5]     Due to plaintiff's history of back pain, Cleveland Clinic neurologist Dr. Gostkowski  examined him in April and August 2013 (Doc. 9, plaintiff. 469-72, 474-78).  His notes document largely normal examination findings, with the exception of "mild pain related weakness in the left hand." Dr. Gostkowski noted plaintiff "is not concerned about ambulation or mobility," had normal gait including arm swing, and was able to tandem, heel and toe walk "without difficulty" at both examinations.

[6]     Dr. Tran examined plaintiff in May 2014, and performed manual muscle testing and range of motion testing.  He opined plaintiff had moderate limitations with sitting, standing, walking, lifting and carrying due to low back pain and left arm numbness.  He opined that plaintiff could occasionally bend, stoop, crouch, squat, reach, handle, finger, and grasp. (Doc. 9, p. 578).

for his ongoing reported pain and symptoms related to fibromyalgia, lower back pain, and other reported join pain in his shoulders, knee, and hips" as well as "medication refills." (*Id.* at 902, 910-11). Finally, the ALJ discussed Dr. Blankfield's area of specialization, noting that Dr. Blankfield "is not a specialist in infectious disease, neurology or rheumatology," and therefore she gave greater weight to the examination findings of a neurologist, Dr. Gostkowski.[7] Thus, contrary to plaintiff's assertion, the ALJ addressed every factor set forth in 20 C.F.R. § 404.1527(d) and provided good reasons for her determination that Dr. Blankfield's 2014 opinions were entitled to "scant" weight.

Plaintiff also argues that the ALJ erred in describing the treating relationship and treatment records provided by Dr. Blankfield. He asserts that the ALJ's description of Dr. Blankfield's treatment notes as "devoid of any functional examinations, tests, or evaluations," is inaccurate. He also notes that in the two years prior to the opinion, Dr. Blankfield "ordered testing, including cervical spine x-ray, thoracic spine x-ray, and bone density scan." (Doc. 18, p. 5). The ALJ's statement is inaccurate if the reader assumes that the adjective "functional" applies only to the first item in the list: examinations. The ALJ was clearly aware that Dr. Blankfield ordered diagnostic tests and evaluations, but that diagnostic imaging is distinct from functional examination, functional evaluation, or functional testing.[8] This failure to

---

[7]     Although this analysis is not in the section of the ALJ's decision discussing Dr. Blankfield's opinion, the Court is permitted to consider the decision as a whole. *See, e.g., Lecea v. Comm'r of Soc. Sec.,* 2017 WL 941832 at * 9 (E.D. Mich. Feb. 22, 2017).

[8]     The 2012 imaging revealed normal bone density, some narrowing of foramina in the cervical spine, and mild vertebral compression with deformities at the thoracolumbar junction. (Doc. 9, p. 559-61). An MRI of plaintiff's lumbar spine taken in 2013 revealed

provide support for his opined functional limitations is the issue at the heart of the ALJ's assessment, and therefore, even though she did not repeat the word "functional" before "tests, or evaluations," her meaning is clear. Further,  Dr. Blankfield's notes do not indicate he was performing full physical examinations at plaintiff's visits, but state that he prescribed fentanyl, oxycodone, gabapentin, and cortisone injections for plaintiff's back and hip pain (*id*. at 533-35, 667, 672, 705).  He recommended physical therapy and a consult with a neurologist (*id*. at 535, 545).  Neither plaintiff nor, more importantly, Dr. Blankfield, offers any explanation for how this imaging and treatment record, showing mild abnormalities conservatively treated with medication, support the extreme limitations in Dr. Blankfield's 2014 opinion.

Finally, plaintiff asserts that the ALJ should have specifically discussed fibromyalgia when explaining her assessment of Dr. Blankfield's opinions.  Dr. Blankfield did not identify that impairment as a cause for his opined limitations in either of the 2014 opinions, nor do these opinions discuss trigger points or use any other terminology relating to fibromyalgia. Dr. Blankfield's treatment notes from February 2014 indicate that plaintiff "states another physician dx him [with] fibromyalgia." (Doc. 9, p. 533).[9]  In his June 2014 treatment note,

---

"mild degenerative disc disease."  (*Id*. at 557-58).

[9]     In a 2017 opinion Dr. Blankfield stated that plaintiff "has a long-standing fibromyalgia-like condition that is most likely the result of the West Nile Virus meningitis. The fibromyalgia should have qualified him for disability years ago." (Doc. 9, plaintiff. 1648-49).  However, even in this later opinion, Dr. Blankfield did not explain how plaintiff's fibromyalgia affected his functional ability.  Instead, the 2017 opinion focuses on Dr. Blankfield's belief that neurological examination would demonstrate "advancing neurological deterioration" including symptoms of

10

Dr. Blankfield's discussion of plaintiff's fibromyalgia is limited to the observation that "cyclobenzaprine makes his mouth dry." (*Id*. at 675).  In August 2014, Dr. Blankfield's notes state that "[f]or the fibromyalgia and low back pain, I recommend trying fentanyl 50mcg every 3 days," with no further discussion. (*Id*. at 705, 713).  While Dr. Blankfield's later notes - from 2019 and 2021 - did indicate the presence of "multiple discrete trigger points of pain involving the thoracolumbar spine," these more complete examination notes still do not identify the number or specific location of the trigger points, and treatment is still limited to the prescription of fentanyl patches.  (*Id*. at 1706, 1740, 1743.)  Other examination notes from the same period do not mention any trigger points. (*Id.* at 1757).  Further, plaintiff had other conditions documented in Dr. Blankfield's records, including mild degenerative disk disease, which can have common symptoms including "neck, back, shoulder and hip pain."  Plaintiff fails to demonstrate that, as of the time the opinion was issued in 2014, the ALJ had sufficient evidence to determine how Dr. Blankfield believed plaintiff's fibromyalgia affected his functional capacity.  Any such analysis would have been improperly speculative.

As the Sixth Circuit made clear, if "the treating physician's opinion is 'unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence,'" that is a "good reason" for giving that opinion less than controlling weight.  *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 253 (6th Cir. 2016) (citing *Morr v. Comm'r of Soc. Sec.*, 616 F. App'x 210, 211 (6th Cir. 2015) (citing *Bogle v. Sullivan*, 998 F.2d 342, 347  48 (6th Cir. 1993))).  This identification of inconsistent evidence does not need to be contained in the discussion of

---

ataxia, dysphasia, and dysarthria that are "late complications resulting from a case of West Nile Virus that occurred in 2001."

the opinion.  *See Nelson v. Comm'r of Soc. Sec*., 195 F. App'x 462, 472 (6th Cir. 2006)

(ALJ's discussion of the other evidence "implicitly provided sufficient reasons for not giving

... controlling weight" to the treating physicians);  *Coldiron v. Comm'r of Soc. Sec*., 391 F.

App'x 435, 440  441 (6th Cir. 2010) ("An ALJ may accomplish the goals [of the "treating

physician" rule] by indirectly attacking the supportability of the treating physician's opinion

or its consistency with other evidence in the record.").  Here, the ALJ identified inconsistent

evidence such as the MRI results and functional evaluations performed by neurologists Dr.

Gostkowski and Dr. Kumar, and clearly explained why Dr. Blankfield's medical records were

insufficient to support his opined limitations. The ALJ's opinion as a whole addresses the

relevant statutory factors, and therefore this objection is without merit.

### B. Opinion of Dr. Juguilon

Dr. Juguilon, another of Plaintiff's treating physicians, also offered two opinions in

2014.  In March 2014, Dr. Juguilon filled in a short answer questionnaire.  She identified

eleven conditions, including fibromyalgia, viral syndrome, and chronic fatigue, as the source

of plaintiff's impairment.[10]  She set forth the date and summarized the examination results

supporting plaintiff's fibromyalgia diagnosis, and attached lab testing relating to his viral

syndrome.  She stated that plaintiff "is not able to perform any type of sustained physical

activity" due to his "random and unpredictable" symptoms of dizziness, "very low energy and

stamina," and joint and muscle pain in both upper and lower parts of his body. (Doc. 9, p.

---

[10]    Other diagnoses listed by Dr. Juguilon include hypo gamma
globulinemia, hypolipidemia, insulin resistence, vitamin D
deficiency, history of West Nile meningitis, history of obstructive
sleep apnea, history of hypertension, and history of
hypothyroidism.  (Doc. 9, p. 570).

12

570-71).

The ALJ explained her assessment of this opinion in a brief paragraph:

> On March 6, 2014, Dr. Juguilon opined, "He (the claimant) is not able to perform any type of sustained activity" due to his symptoms of dizziness, low energy and stamina, and joint and muscle pain (4F/3-5; 6F/3-5). No weight is given to this opinion, as it is conclusory and reserved to the Commissioner as to the claimant's ability to engage in work activities. Further, the findings of the examining neurologist, Dr. Gostkowski contradict this opinion (3F/30-34).

(Doc. 9, p. 910).  In this form, Dr. Juguilon clearly identifies the diagnoses which support her opined limitations, including the diagnosis of fibromyalgia.  She also attaches the diagnostic report which supports the diagnosis of fibromyalgia.

Plaintiff's assertion that the ALJ failed to properly evaluate the factors set forth in 20 C.F.R. § 404.1527(d) and provide good reasons for her determination that Dr. Juguilon's 2014 opinions were entitled to "scant" weight is without merit.  As discussed below, the ALJ explained that, while she accepted Dr. Juguilon's diagnosis of fibromyalgia, the extreme functional  limitations in her opinion were not supported by her own treatment records, nor were they consistent with other record evidence.  The ALJ detailed both the "length and frequency" and the "nature and extent" of Plaintiff's treating relationship with Dr. Juguilon, as well as discussing Dr. Juguilon's area of specialization.

The ALJ clearly credited Dr. Juguilon's diagnostic findings.  She explained that these findings are the sole record evidence supporting her conclusion that plaintiff has a severe impairment of fibromyalgia.[11]  Further, she reasonably rejected the opinion that plaintiff could

---

[11]    Although plaintiff received infusion therapies at Dr. Juguilon's practice periodically until at least July 2015, Dr. Juguilon did not note the presence or absence of tender points in any other treatment notes.

13

perform "no sustained physical activity" as conclusory.  The limitations in Dr. Juguilon's opinion were both vague and overbroad.  For example, Dr. Juguilon explained that plaintiff's "symptoms of dizziness occur at random and unpredictable" times, but neither her treatment notes nor her opinion offer any detail regarding how frequently plaintiff experienced these symptoms, or what measures he took to cope with them.[12]  Nor did Dr. Juguilon give any indication of what she meant by "sustained physical activity," either in terms of duration or level of exertion.  This type of information is critical to an ALJ in evaluating a claimant's functional capacity.

In May 2014, Dr. Juguilon completed the same form provided by Dr. Blankfield, entitled "Medical Source Statement: Physical Abilities and Limitations."  On this form, she was more specific in identifying the functional limitations but provided only terse explanations for her conclusions. (Doc. 9, p. 584-85).  For example, Dr. Juguilon opined that plaintiff could work 0 hours in a day because "[h]e is on pain medication patches for muscle and joint pains," and would have absences due to "pain (joint & muscle) & fatigue, dizziness with postural change." (*Id*.)  She opined that he could stand and walk for only 15 minutes at a time due to "compression fractures of thoracic spine (2 levels) & slipped cervical disks." (*Id*.)

Plaintiff again asserts that both the ALJ and the Magistrate Judge erroneously evaluated Dr. Juguilon's opinion only under the "substantial evidence" standard, and failed to

---

[12]    In January 2014, Dr. Juguilon noted that plaintiff's "headache and dizziness are less." (Doc. 9, p. 499).  In December 2014, nine months after her first opinion, she noted plaintiff was "less dizzy" and had "no headaches." (*Id*. at 761).  However, while these notations are suggestive of improvement, they are vague, especially given that she did not document the initial frequency or severity of these symptoms.

address the other factors set forth in 20 C.F.R. § 404.1527 and 416.927.[13]  This is inaccurate.
With regard to consistency, the ALJ explained why she found Dr. Juguilon's treatment notes
inconsistent with other record evidence including the neurological examinations performed by
Dr. Gostkowski and Dr. Kumar,[14] and MRI imaging.  (Doc. 9, p. 910).  Although plaintiff
argues that it was inappropriate for the ALJ to rely on neurological examination notes when
evaluating fibromyalgia, this overlooks the fact that Dr. Juguilon's treatment records indicate
she treated him extensively for the viral syndrome related to his history of West Nile virus
infection, which was also the reason for his 2019 evaluation by Dr. Kumar.   Neither the
opinions nor Dr. Juguilon's medical records provided the ALJ with sufficient information to
determine what limitations were linked to fibromyalgia, and therefore the ALJ reasonably
relied on all record information relevant to the impairments for which Dr. Juguilon treated
plaintiff.

　　　　The ALJ also discussed Dr. Juguilon's area of specialization, noting that Dr. Juguilon
"is a family practice physician, is not a neurologist or a specialist." (*Id*.)  With regard to the
"the length, frequency, nature, and extent" of plaintiff's treating relationship with Dr.

---

[13]　　　In making this argument, Plaintiff acknowledges that the ALJ did
identify substantial evidence in support of her weighing of Dr.
Juguilon's opinions.

[14]　　　Dr. Kumar examined plaintiff in 2019 in relation to his West Nile
virus infection and lingering neurological symptoms, including
tremors. (Doc. 9, p. 1713).  He found normal results in the
neurological exam, with the exception of "some imbalance," and
he noted plaintiff used a cane to walk safely. (*Id*. at 1714).  Dr.
Kumar attributed the tremor to side effects of medications,
including bupropion, and assessed the imbalance as "multifactoral,
including osteoarthritis, degenerative joint disease of the spine,
medications such as gabapentin and fentanyl patch." (*Id*.)

Juguilon, the ALJ acknowledged Dr. Juguilon as a treating source and noted that she had begun treating plaintiff in September 2013. (*Id*. at 909). Therefore, the factors set forth in 20 C.F.R. § 404.1527(d) were addressed and plaintiff's objection is without merit.

The ALJ again explained that some of Dr. Juguilon's opined limitations were too vague to be useful in assessing plaintiff's functional capacity. For example, the statement that plaintiff would have difficulty sitting because he "has to shift position every 30 minutes" was vague because it did not explain "whether this is shifting in his seat, shift to standing in one place, or shift to moving or walking around." (*Id*. at 910).

Further, Dr. Juguilon's two opinions suggest considerable improvement during the three months that elapsed between them. In March 2014, plaintiff was "unable to perform any sort of sustained physical activity." By May 2014, he could sit for four hours with intermittent breaks, had no difficulty with fine manipulation or fingering, could "handle" without difficulty unless he was required to open a tightly-closed bottle, and could reach without difficulty as long as he did not need to bend at the torso. This impression is supported by Dr. Juguilon's March 2014 opinion and her treatment notes. In her March 2014 opinion, she stated that the antiviral medication she prescribed had lessened his headache and dizziness, although there is no baseline or specificity regarding the extent of the improvement. (*Id*. p. 571). Her treatment notes from July 2014 state that plaintiff reported his medication "seems to be working" and "headaches have resolved" (*Id*. p. 760), and in December 2014 she noted that he was "less dizzy and no headaches." (*Id*. p. 761).

Plaintiff also asserts that the ALJ failed to consider plaintiff's fibromyalgia in assessing Dr. Juguilon's opinion. This, too, is without merit. Although Dr. Juguilon

16

identified fibromyalgia as one of eleven relevant diagnoses in the March 2014 opinion, she did not identify it as the cause of any of her opined limitations in the second opinion. Instead, she based her opinion on other physical impairments which she identified. For example, she identified plaintiff's spinal compression fracture and "slipped cervical disks" as the cause of his standing and walking limitations. She opined that he could work zero hours on a typical day because "he is on pain medication patches for muscle and joint pains," and would have an unspecified number of work absences due to "pain (joint + muscle) and fatigue, dizziness with postural change." (Doc. 9, p. 584-85). Here, the ALJ would have to speculate whether Dr. Juguilon believed these symptoms were side effects of the pain medication, or were due to fibromyalgia or one of the other diagnoses that she identified on the opinion form which can cause similar symptoms, including chronic fatigue, viral syndrome, insulin resistence, and vitamin D deficiency. Such speculation would require the ALJ to improperly "play doctor" by making independent medical findings.

Plaintiff asserts that the ALJ failed to consider the record as a whole in assessing this opinion evidence. However, she fails to identify evidence other than the opinions of Dr. Blankfield, discussed *supra*, that support the extreme limitations in Dr. Juguilon's opinion. Dr. Juguilon's treatment notes document treatment for plaintiff's viral syndrome, as well as mitochondrial nutritional IV therapy, oral supplements, and recommendations for dietary changes. She notes that plaintiff's weight probably contributed to his joint pain (*id.* at 760), and recommended dietary changes at nearly every appointment. She also repeatedly advised him of the importance of using his prescribed CPAP machine to improve the quality of this sleep. (*Id.* at 500, 503, 505). Neither her treatment notes nor her opinions provide insight

into what role she believed fibromyalgia played in plaintiff's functional impairment, nor does she appear to have documented trigger points or provided treatment specifically for fibromyalgia at any subsequent appointment.  Further, although her March 2014 opinion lists fibromyalgia as one of 11 diagnoses for which she is treating plaintiff, she never identifies it as a cause of his disability.  Her May 2015 opinion attributes his physical limitations to spinal compression fractures, slipped cervical discs, and a variety of symptoms     including joint and muscle pain, fatigue, and dizziness with postural change.  These symptoms are consistent with fibromyalgia, but also consistent with the conditions that Dr. Juguilon discussed in her treatment notes: viral infection, sleep apnea, and obesity.[15]

As discussed previously, the ALJ identified fibromyalgia as a severe functional impairment based solely on Dr. Juguilon's testing, and therefore clearly did not overlook this aspect of the record.  However, none of Dr. Juguilon's subsequent treatment notes discuss tender points or fibromyalgia.  A single tender point examination and laboratory testing did not give the ALJ the factual basis for a detailed assessment of how fibromyalgia, specifically, affected plaintiff's residual functional capacity.  The ALJ's conclusion that this limited treatment record indicates that "the pain and other symptoms related to fibromyalgia do not prevent [plaintiff] from performing the reduced demands of light work" in her residual

---

[15]    In his reply, plaintiff also asserts the ALJ should have provided a more detailed analysis of the role of West Nile virus in his functional limitations.  However, the same issue applies to that diagnosis.  Although Dr. Juguilon more actively treated plaintiff's viral syndrome, neither her notes nor her opinions provide clarity on how she believed it affected plaintiff's functional abilities.  Neurologist Dr. Kumar, who assessed plaintiff for lingering effects of his West Nile infection in 2019, did not identify it as having a significant impact on plaintiff's functional abilities.

18

functional capacity determination is not error.

The crux of plaintiff's argument appears to be that it is improper to require that a physician's opined limitations be supported by objective testing or medical findings where there is a diagnosis of fibromyalgia, because that illness is "not amendable to objective diagnosis." (Doc. 16, p. 4).  However, it is also true that the "a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits."  *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008).   Here, as in *Vance*, the ALJ acknowledged that plaintiff had a severe physical impairment of fibromyalgia.  Yet, "[w]hile it is undisputed that [claimant] has the necessary objective medical conditions to support [his] claim, the contested issue is the severity of the symptoms resulting from those conditions."  *Id.* at 806-07. Therefore, the ALJ appropriately sought other record evidence to assess severity.  As the ALJ noted, neither Dr. Juguilon nor Dr. Blankfield prescribed therapies commonly used to lessen the severity of fibromyalgia, such as physical or occupational therapy.  Dr. Juguilon described her plan for treatment as comprising antiviral medication, intravenous nutrient infusion for liver detoxification, and oral nutritional supplements to boost immune resistence. (Doc. 9, p. 570).

Dr. Juguilon did not specifically attribute any of her opined limitations to fibromyalgia, although she - like the ALJ - identified it as a contributing cause of plaintiff's limitations in her first 2014 opinion.  Therefore, the ALJ's omission of a specific discussion of how fibromyalgia influenced Dr. Juguilon's opinion is both understandable and proper, as such analysis would necessarily have been speculative.

**2.    Assessment of pain and other symptoms**

19

Plaintiff's second objection asserts that the Magistrate Judge erred in two ways: by applying an outdated standard and by failing to realize that the ALJ had impermissibly substituted her own judgment for that of plaintiff's doctors. Specifically, plaintiff alleges a violation of Social Security Ruling 16-3p, which instructs the ALJ to consider the claimant's credibility by comparing the claimant's statements with the objective medical evidence. SSR 16-3p lists the factors relevant to the ALJ's credibility determination concerning the claimant's alleged disabling symptoms. *Rogers*, 486 F.3d at 247. These factors include the individual's daily activities; the location, duration, frequency and intensity of the individual's pain or other symptoms; any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain, and, "[a]ny other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, 2017 WL 5180304, at *7-*8. An ALJ is not required to discuss all the factors listed in SSR 16-3p, but should sufficiently articulate her assessment of the evidence to assure the court that she considered all relevant evidence. *Cross v. Comm'r*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

Plaintiff asserts that the ALJ made a factual error by asserting that Dr. Blankfield relied on Dr. Juguilon's trigger point test rather than conducting his own examinations. He also argues that the ALJ failed to consider the side effects of his medication in assessing his residual functional capacity.

Some of Dr. Blankfield's notes are illegible. Those that are legible support the ALJ's assertion that Dr. Blankfield relied primarily on another doctor's diagnosis of fibromyalgia.

20

In a June 2014 record cited by plaintiff as demonstrating Dr. Blankfield's independent examination, he states plaintiff "[h]is [sic] been told in the past that he has fibromyalgia," before noting that plaintiff "has numerous trigger points of tenderness involving the anterior chest wall and posterior back," but "no tenderness to palpation of the elbows or knees." (Doc. 9, p. 672, 674).  None of Dr. Blankfield's treatment notes record the number or location of trigger points with the specificity necessary to support an independent diagnosis of fibromyalgia.[16]  Dr. Blankfield's examination notes report "multiple trigger points of pain involving the thoracolumbar spine" and do not specify the number or location of the trigger points.  They also report no acute distress, no limitation to mobility except use of a cane, no falls, full or 4/5 motor strength in all muscle groups, and normal sensation and movement in both upper and lower extremities.  (*See, e.g.*, Doc. 9, p. 1685, 1691, 1706, 1740).

It is undisputed that Dr. Blankfield's examination notes do not record the number or specific location of plaintiff's trigger points, nor do they include examination findings to establish his functional abilities, such as range of motion testing, assessing grip strength, or observation of his gait.  They also do not document any subjective description of the effect of plaintiff's pain on his activities of daily living.  Thus, the ALJ accurately described them as "vague."  This makes these records of limited value to an ALJ seeking to understand the effect of plaintiff's fibromyalgia on his functional capacity.   Further, while objective medical

---

[16]     Due to the pandemic, many of the later visits were virtual, and did not include any physical examination.  Later records cited by plaintiff describe his medical visits with Dr. Blankfield as "medication [follow up]" or "medication refills." (*Id.* at 1679, 1682, 1685, 1688, 1691, 1706, 1715, 1723, 1730, 1740, 1743, 1746, 1753).

evidence cannot measure a claimant's pain, a medical examination can document the effect of pain on a claimant's functional abilities.  Here, the ALJ's reliance on the functional ability findings of consultative examiner Dr. Tran and neurologists Dr. Gostkowski and Dr. Kumar[17] is not error, particularly because other treatment records do not include complete physical examinations or functional evaluations.

Plaintiff also objects that the ALJ improperly questioned the "ongoing diagnosis of fibromyalgia" at the hearing by asking plaintiff's counsel, "where does the actual diagnosis and the treatment mesh? .... where does Dr. Blankfield continue to document the persistent existence of fibromyalgia, sufficient to continue to prescribe him fentanyl?" (Doc. 18, p. 10 (quoting Doc. 9, p. 956)).  While the question could have been phrased differently, it is clear that the ALJ was attempting to understand the connection between plaintiff's self-report of disabling pain and physical limitations and Dr. Blankfield's care, which was largely limited to measuring his height, weight, and blood pressure, screening for depression, and prescribing pain medication.  The ALJ explained to the plaintiff that "what's more important than the specific diagnosis    it's the function.  How does the person function?" (Doc. 9, p. 956).  She was explaining that, when a petitioner's impairments do not meet or equal a listing, she must assess a claimant's residual functional capacity to determine disability.  She asked plaintiff and his counsel whether any of the records they provided included "anything that ... identifies more documentation of testing," or of Dr. Blankfield's observations of plaintiff's functional

---

[17]    Dr. Kumar's examination findings are not directly relevant to the 2014 opinions because he examined plaintiff in July 2019, however, they were relied on by the ALJ in determining plaintiff's residual functional capacity at the time of the 2022 decision.

abilities throughout the treatment period. (*Id*. at 956, 984). The ALJ's attempt to determine whether plaintiff or his counsel had relevant information which she had been unable to identify was not improper.[18]

Plaintiff also asserts that "the ALJ's decision makes clear that she held [plaintiff's] failure to obtain low-cost treatment as evidence that his pain and other symptoms were not disabling." (Doc. 18, p. 12). It is true that, at the 2019 hearing, the ALJ noted the lack of recent medical evidence, and pressed plaintiff regarding why he had not obtained low-cost care and treatment during the period between his November 2017 and October 2019 hearings. As both the ALJ and Magistrate Judge noted, the degree of treatment a claimant pursued is relevant to an ALJ's inquiry. In the most recent ALJ decision, the ALJ briefly discussed plaintiff's 2019 testimony that he had not sought affordable medical care and noted that certain treatments were affected by plaintiff's inconsistent insurance coverage, such as the physical therapy plaintiff received from November 2012 through June 2013, which ended before he had reached his goals "due to limitations in insurance coverage." (Doc. 9, p. 361). However, the ALJ placed greater emphasis on the fact that, even when plaintiff had insurance coverage "treatment plans during the relevant period were conservative in nature, involving mainly outpatient office visits and medication management." (*Id.* at 906).

Next, plaintiff objects that the ALJ "failed to consider" the effects of his medication in her assessment of his residual functional capacity. Plaintiff acknowledges that the ALJ's

---

[18]   Notably, in response the the ALJ's query, plaintiff's counsel acknowledged that he could not determine, from the record, whether Dr. Blankfield prescribed fentanyl "due just to fibromyalgia, or a combination of some painful impairments," because "I can't play medical doctor." (Doc. 9, p. 957).

decision limited him to "frequent balancing" as a result of medical record information showing that his use of fentanyl, bupropion, and asthma medications could exacerbate his tremors and aggravate his balance issues.[19]  Nevertheless, he asserts that the ALJ "ignored" the side effects of fentanyl.  However, the only side effects that plaintiff discusses in his objection are impaired balance and tremors.  As late as 2019, when Dr. Kumar examined him in relation to these issues, plaintiff "said that he would put up with the problem because it is not interfering significantly with functionality."  (Doc. 9, p. 1714).  Because it is undisputed that the ALJ provided accommodation for plaintiff's balance issues and tremors in her determination of his residual functional capacity, it is not necessary for the Court to determine whether these were properly categorized as side effects of medications or symptoms of illness.

Finally, plaintiff objects that the ALJ "did not understand the nature and extent" of his West Nile Virus infection.  The Magistrate Judge concluded that, because the ALJ considered plaintiff's "history of West Nile Virus in combination with [his] other impairments" when determining her RFC, her analysis of this impairment was sufficient.  Plaintiff focuses on the Magistrate Judge's use of the word "history" to indicate that the ALJ did not consider his "post-West Nile virus syndrome" after his initial infection in 2002, or the re-emergence of the virus in 2013.[20]  In July 2017, Dr. Blankfield opined that "It is my medical opinion that

---

[19]  Under Social Security Regulation 83-10, "frequent" means occurring from one-third to two-thirds of the time.

[20]  Plaintiff's objection calls the 2013 positive test for West Nile virus a "re-emergence" of his 2002 infection and also implies it was a second infection, stating the ALJ erred because she "clearly believed the infection was on one occasion."  (Doc. 18, p. 14).  He provides no medical basis for the assertion that plaintiff was infected with West Nile virus on two separate occasions.

24

[plaintiff's] ataxia, dysphasia and dysarthria are late complications resulting from a case of West Nile Virus meningitis that occurred in 2001. . .. He ought to be under the care of a neurologist." (Doc. 9, p. 1648-49).  However, as with his 2014 opinion, Dr. Blankfield failed to explain the basis for this assertion, or identify relevant treatment records.  Both plaintiff and the ALJ acknowledged that Dr. Juguilon was the provider who treated plaintiff for West Nile virus in the relevant period.  As the ALJ noted, neither Dr. Juguilon's opinions nor her treatment records identify functional limitations arising from this issue.  In addition, neither of the neurologists who examined plaintiff identified limitations resulting from West Nile virus. Therefore, the ALJ did not err in assessing West Nile virus, regardless of whether it was the initial infection or a "re-emergence" in 2013.

## **CONCLUSION**

For the foregoing reasons, the Report and Recommendation of Magistrate Judge Carmen E. Henderson is ACCEPTED, and the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

_/s/ Patricia A. Gaughan_
PATRICIA A. GAUGHAN
United States District Judge

Dated:  8/31/23